I,CANNELLA, J.
Richard Martinez (Defendant and Plaintiff in reconvention) (Martinez), appeals a damage award in a carpentry contract dispute with Albert Hernandez (Plaintiff and Defendant in reconvention) (Hernandez). We affirm.
On October 19, 1996, Martinez contracted with Hernandez for custom carpentry work. Martinez hired Hernandez based on recommendations by friends and Hernandez’s assurance that he could provide and install specialty “high end” trim woodwork. The job included trimming two existing Pella windows using rosettes, fluted casings and keystones, trimming the ceiling of the foyer using a five-part cornice with five-part substrate materials, “according to selected molding”, trimming eleven door units with fluted casings, rosette and plinth blocks, constructing a wood mantel over the existing fireplace, hanging an existing antique mirror above the fireplace, removing a wet bar located under the stairway and converting the space to an entertainment area for a television and bother electronic equipment, providing new baseboard in the foyer and den, and painting the above carpentry work. The price for the job was $19,700.
As the job progressed, some changes were made. Prior to installing the wood mantel, it was redone because Martinez’s dogs damaged it. This cost an extra $557.20. The air return vent in the foyer was re-routed, which cost $325. In addition, Hernandez agreed to terminate the plumbing and perform some electrical work in the wet bar renovation for $410. Hernandez and his crew also re-routed the clothes dryer vent in the garage, patched those walls, and installed a vent for the dryer in the existing roof. This was an additional $201. Extra materials for the electronic cabinet and television configuration was billed at $130.
*817 On April 7, 1997, Hernandez and his crew left the job, removed all of their equipment and tools, and subsequently billed Martinez for the balance owed of $4,773.20. However, Martinez refused to pay, claiming that the work was not complete and that the workmanship of some of the wood, the installation and the paint work was poor and/or incomplete. He contended that Hernandez was hired to perform the work himself, but allowed his son and others to do work that is considered specialty work. He complained that Hernandez used inferior lumber for the rosettes, the rosettes were poorly sanded and repainted, the arches over the windows are skewed and visibly uneven, and that Hernandez replaced some defective rosettes with store bought, rather than handmade ones. Martinez further contended that Hernandez failed to install the complete eleven piece crown molding ordered from Driwood, an architectural mill-work specialty company, specifically the trim around the dentils (decorative blocks of wood that resemble teeth). Martinez claimed that the sheet rock around the entertainment area was |4not finished, the casing on the baseboard of the back den wall is uneven, and the fireplace mantel was over painted, obscuring details on the wood and metal. He also complained that other parts of the woodwork were either over or under painted. In addition, Martinez asserted that the antique mirror that was hung by Hernandez and/or his crew was destroyed when someone cleaned the back of the mirror with a solvent, causing streaks, which cannot be removed, to appear on the mirror surface.
As a result of Martinez’s refusal to pay the balance billed to him, Hernandez filed suit on September 9, 1997. Martinez responded with an answer and reconventional demand on October 29, 1997, demanding the amount of money it would cost to redo the unsatisfactory work.
A judge trial was held on November 17, 1999. On March 3, 2000, judgment was rendered in favor of Hernandez in the amount of the balance owed, $4,516, with judicial interest. The trial judge further awarded Martinez the amount of $2,000 for his damages, with judicial interest, to be offset against the amount owed to Hernandez. Further, Hernandez was ordered to release all liens filed against Martinez, his wife, and his house. In her reasons for judgment, the trial judge found that Hernandez had completed the scope of the work and that he had done more than was required in some instances. However, she also found that there were areas that were not satisfactory and needed to be redone. She only awarded $2,000 because she found that some of the complaints were trivial and that Martinez was difficult to communicate with toward the end of the job. In addition, although the trial judge found Martinez’s expert, Melvin Ziegler (Ziegler), to be credible, he failed to give a breakdown of the costs to redo the individual items.
|ROn appeal, Martinez contends that the trial judge abused her discretion in awarding inadequate damages for the incomplete and/or poor workmanship. He contends that the lowest amount that the trial judge could have awarded was $11,000 to redo all of the unsatisfactory work, based on the testimony of Ziegler.
Hernandez testified that he has been doing custom trim work for 35 years and that he receives his contracts by referrals. When he and Martinez met, they went over the job. At that time he informed Martinez that he worked with a crew that was under his supervision, but that he would also do some of the work. Hernandez stated that he is not as “hands on” in recent year’s as he used to be. The crew consisted of Hernandez’s son, Chris, Thor *818 Rohr, who had been with him since 1992, and his son-in-law, Mark Carroza, who worked with him from 1991 until 1998.
Hernandez testified that when he looked at the various areas of work, he noticed that the jambs on the arches over the windows were not even and did not line up with the jambs on the rectangular windows below. Because of this, he told Martinez that the work on the arches would not be perfect unless he reinstalled the windows. Martinez did not want to do that and Hernandez thought he understood that without doing so, the work over the jambs would not be perfect.
Hernandez stated that at the time the contract bid was executed, Martinez did not know what style of cornice he wanted, so Hernandez drew a rough picture of one for him to consider that was within the price quoted. Martinez did not like it, but instead supplied Hernandez with a catalog of moldings and architectural millwork made by Driwood. Martinez chose an eleven piece crown molding from the cata-logue. Hernandez stated that he did not install one piece of the molding that went around the dentils because Martinez told him that he did not want that |fipiece. According to Hernandez, he informed Martinez that the Driwood molding was more expensive than the type he had put in the estimate, but without the extra piece, the price was within the job cost. In addition, he stated that Martinez and his wife thought it was too ornate with the extra bit of molding. Hernandez said that his crew heard this discussion and Chris Hernandez, Thor Rohr and Mark Carroza testified like-wise. Both Martinez and his wife testified to the contrary. They stated that the first time this question arose was after the cornice was installed.
Hernandez testified that all of the wood he used in the job was C quality and better hardwood, which is the best grade of hardwood and does not have knots. The mill work was purchased from Ed Goldman (Goldman), who does first class specialty mill work and who enjoys an excellent reputation in the construction community. Goldman cut all of the rosettes, but some were not acceptable. Hernandez stated that he returned those to Goldman, who agreed and redid them. However, he noted that “cuts” on wood rosettes are never perfect because 50% of the cuts go with the grain of the wood, while the other 50% go against the grain.
Goldman provides specialty millwork for most of the other mills in the city and has done work in most of the historic restorations in the area. Goldman stated that he provided the mantel with Corinthian fluted columns, the “round head” windows’ trim with flutes and rosette blocks, and detail block moldings with rosettes on some doors. The rosettes are hand carved and placed on the top corners of the doors. Because they are hand made, they are never absolutely accurate. However, hand carved work has a softer look. Goldman testified that the rosettes are “shop” sanded by him, but need to be finished, or sanded further before painting. He testified that only plastic can create perfect rosettes. He was |7upset about having to take the rosettes back and redoing them. However, he fixed them by covering them with Bondo, a polyester filling, re-cut and re-sanded them until they obtained a smooth finish. He testified that the mantel was not cracked when it left his shop.
Hernandez testified that he was not present on the job all of time, but he was there every day when the crew arrived and when they left. He stated that Martinez knew that the crew was doing the majority of the work and that the members of the crew were all qualified and did not need supervision. He admitted that he had only installed three sets of nine-piece molding *819 in the past and his son had helped on only one of those. Yet, all of the crew, as well as Hernandez, did some cuts on the Dri-wood molding. The three men, Thor Rohr, Mark Carroza and Chris Hernandez, now work in other types of jobs.
Hernandez noted that he and the crew performed some odd jobs that he did not include on the bill, such as repairing a set of patio doors broken by one of the dogs, redesigning the entertainment area because Martinez kept changing his mind, and moving the furniture and things out of the way every day.
The contract included the hanging of the antique mirror. Hernandez testified that no one used a solvent on the back. According to Hernandez, Chris Hernandez and Thor Rohr, the mirror was cleaned with an ordinary glass cleaner and a soft cloth. Both Hernandez, Chris Hernandez and Thor Rohr denied that Hernandez yelled at Chris Hernandez for cleaning the mirror with mineral spirits. In addition, Chris Hernandez and Mark Carroza testified that the mirror was the same before and after it was hung. Thor Rohr testified that when the mirror was hung, streaks were visible that were not visible before it was hung. This was supported by the testimony of Marian McCray (McCray), the housekeeper for the Martinez family |sat the time. It was noted that McCray no longer worked for Martinez, but was employed by Hernandez.
Hernandez stated that after the job was completed, he and his workers returned on three more days to fix any problems and make sure everything was finished. He said that he does not make a punch list because he does not stop working until the job is finished. Hernandez did not notice any splitting or gaps between the trim and rosettes. However, he did notice some hairline cracks when he inspected the house prior to trial. He thought that those were caused by humidity and the fireplace, which are common causes of wood splits in this area.
According to Hernandez, Martinez appeared to lose interest during the progress of the job. It was increasingly difficult to communicate with him for decisions, as he would not answer his phone calls. Nevertheless, Hernandez stated that when he left the house permanently, the job had been completed and performed in a satisfactory manner.
Chris Hernandez testified that he was responsible for 90% of the work. He agreed that there were problems with the arches over the windows because the existing straight edge was uneven. That part was not installed by the Hernandez crew. Chris Hernandez also testified that his father expected and demanded top workmanship on all of the work in which he was involved. He wanted everything done right. Chris Hernandez installed most of the eleven-piece cornice. He stated that type of cornice is not used much in this area. He further testified that Martinez did not want the “cove molding around the dentils.”
Chris Hernandez stated that he used two different casings on the back and front of the doors, but that they are the same on each side. He said that he had to swap some out because they were not acceptable when they came from |flGoldman’s. Instead of going to Goldman,- or another lumber company, Chris Hernandez replaced them with casings from Home Depot because it was faster. Otherwise, the job would have been delayed for one to two weeks. He did the same with six out of the twenty rosettes. Thor Rohr testified that the Home Depot casings were used on the back sides of the bathroom, the study door and bedroom entrance. Martinez was not informed that this substitution was made.
*820 Thor Rohr testified that he repainted parts of the trim where shadowing showed in the inside grooves. He said that he also spent a lot of time repainting the small spaces between the dentils, using a small artist brush.
Ziegler, the owner of American Architectural Woodcraft, a company that constructs custom woodwork, testified as an expert for Martinez.[1] Ziegler testified that Driwood produces reproduction antique moldings that were used in the original thirteen colonies. He stated that they are not easy to install and require a great deal of expertise. Ziegler stated that the quality of the workmanship in this case is not commensurate with the expensive house in which the work was being done. He found problems with the spacing of the cap locks in the corners in the foyer, said that the painting was substandard because of over and under painting, and that Hernandez had used some Home Depot materials, rather than the custom material which Martinez was promised. He stated that to do the job right, the molding has to be re-sanded and re-painted, adding Flotrall which gives the paint a baked-on finish. Ziegler testified that the fireplace mantel was not cured properly, the flute work is substandard and certain joints on the mantle are improperly connected. He would have put it together on the ground in two pieces Imbefore installing it, rather than working on it after it was installed. Ziegler noted that the casings on the doors were different and unacceptable. He said that Hernandez could have matched the casings by going to the original mill. Furthermore, he stated that the wood should have been primed completely, rather than on one side because the primer prevents the wood from shrinking and cracking, especially around the fireplace. Ziegler stated that the mantel should have been primed while in the shop, which is climate controlled. He testified that there are chip marks on the finished casing, which could have been corrected on the job. Ziegler also testified that this whole job should have been finished within 60 days, rather than the six-months Hernandez took to complete the work. He noted that union carpenters apprentice for ten years before becoming trim carpenters. Ziegler stated that it would cost between $11,000 and $13,000 to redo the work.
Martinez testified that Hernandez said to him that he would do the work himself or supervise the work, if the particular job was easy. He never told Martinez about the Home Depot replacements and knew that Martinez wanted everything to be hand milled. Martinez denied making changes in the entertainment area. In addition, he stated that the arches arrived in four pieces and were cut on more than the 90 degree angle that would have allowed them to fit together. They also had an alligator appearance, as though the wood was cut across the grain with a dull knife. Martinez wanted it sanded and primed before painting. He stated that since the paint was white, the grain should not be visible.
Martinez stated that there were no streaks in the very large mirror, before it was hung. He said that he dressed in front of it. It was only after the mirror was In hung that the streaks appeared. Martinez’s wife, Kathryn, corroborated his testimony.
*821 Hernandez testified that the casings for the arches had to be mitered and cut to fit. He said that sometimes, the cut has to go against the grain. In addition, he stated that the molding was over sprayed in places because he understood that the walls were going to be painted. Although he. agreed with some of the problems found by the experts, he felt that this was a retrofit job and that his work was the best that could be done under the circumstances.
Implied in every building contract is that the work of the contractor is to be performed in a good, workmanlike manner, free from defects in either materials or workmanship. An owner seeking to recover from a contractor for defective workmanship bears the burden of proving the existence and nature of the defects and that the defects were due to faulty materials or workmanship. Industrial Roofing & Sheet Metal Works, Inc. v. J.C. Dellinger Memorial Trust, 32-048 (La.App. 2nd Cir.8/20/99), 751 So.2d 928, 939; Bourgeois v. Arrow Fence Co., Inc., 592 So.2d 445, 448 (La.App. 5th Cir.1991); Guy T. Williams Realty v. Shamrock Const. Co., Inc., 564 So.2d 689, 694 (La.App. 5th Cir. 1990), writ denied. 569 So.2d 982 (La. 1990). In Martinez v. Reno, 99-114 (La. App. 5th Cir.9/15/99), 742 So.2d 1014, 1016, we stated:
Under La. Civil Code art. 2769, if an undertaker fails to do the work ..., or if he does not execute it in the manner ..., he shall be liable in damages for the losses that may ensue.... The owner is entitled to “the cost of repairs necessary to convert the unsound structure to a sound one or the amount paid to remedy the defect.” [Citations omitted]
The standard for reviewing the award of damages for breach of contract is whether the trial judge abused her discretion. Mayerhofer v. Three R’s Inc., 597 So.2d 151, 155 (La.App. 3rd Cir.1992). See also: Martinez v. Reno, 742 So.2d at 1016 and Rivnor Properties v. Herbert O’Donnell, Inc., 92-1103 (La.App. 5th Cir.1/12/94), 633 So.2d 735, 747.
In this case, the trial judge was impressed with the testimony of Ziegler. However, because he failed to itemize the cost of the various defects individually, she was unable to separate those which she found to be meritorious from those that were not the fault of Hernandez. Although the trial judge did not list the items which she found to be compensable, she concluded that Martinez was not entitled to full compensation because she thought that some complaints were trivial. Notably, several pieces of the molding were presented into evidence at trial, but were not made available to this Court. Based on the evidence, we do not find that the trial judge erred in her conclusion. Further, we find no abuse of the trial judge’s discretion in the award to Martinez.
Accordingly, the judgment of the trial court is hereby affirmed.
Costs of appeal are to be paid by Martinez.
AFFIRMED.

. Martinez produced the testimony of two expert witnesses, Marc Dahlman (Dahlman), a construction consultant and certified home inspector, and Ziegler. The trial judge relied on Ziegler’s testimony because he is a specialist in the area of custom woodwork, whereas Dahlman’s expertise is general. Since Martinez does not dispute this, we will only refer to Ziegler's testimony.