MICHAEL E. KIRBY, Judge.
 

 11 Defendant, Factory Direct Installations, Ltd. (“FDI”), appeals two trial court judgments: (1) the May 4, 2005 judgment in favor of plaintiffs, Edward and Timmie Taaffe, and against FDI in the amount of $23,899.50 plus interest from date of judicial demand and all costs of proceedings, and (2) the July 26, 2005 judgment denying FDI’s motions for new trial.
 

 On October 20, 1998, plaintiffs filed a petition for damages and breach of contract against FDI; Paul Lacinak, the owner and president of FDI; and Alan Cas-sell, regional manager of FDI.
 
 [1]
 
 In their petition, plaintiffs alleged that they entered into a contract with defendants on October 30, 1997 for repairs to be made at their home at 1624 East St. Bernard Highway in Chalmette, Louisiana. Plaintiffs claimed that defendants failed to complete all of the contracted work and further claimed that the work was not performed in a professional or workmanlike manner. Plaintiffs alleged that defendants also caused damage to plaintiffs’ house and land while working on the property.
 

 LOn November 30, 1998, FDI filed an answer and reconventional demand. In its answer, FDI admitted to entering into a contract with plaintiffs on October 30, 1997, but denied that the other named defendants, Paul Lacinak and Alan Cas-sell, were parties to the contract. FDI admitted that the contract covered certain repairs and improvements to the plaintiffs’ property but denied plaintiffs’ allegation that the contract included cosmetic en-háncements to the home. FDI denied the remainder of plaintiffs’ allegations. FDI filed a reconventional demand against plaintiffs, which included requests that plaintiffs’ petition be dismissed and that plaintiffs be ordered to pay the balance of the contract price agreed to by the parties. According to FDI, the contract price for
 
 *564
 
 the repair work was $16,988.00, and plaintiffs only paid a $4,000.00 down payment, leaving a balance due and owing of $12,988.00. A copy of the October 30, 1997 contract between plaintiffs and FDI was attached as an exhibit to FDI’s answer and reconventional demand.
 

 FDI subsequently filed a third party demand against Essex Insurance Company (“Essex”), alleging that at all pertinent times, Essex had in full force and effect a commercial general liability insurance policy and other policies providing coverage to FDI for the types of claims asserted against FDI by plaintiffs. Essex answered the third party demand, denying that it provided coverage for the claims asserted in this matter. Essex also filed a petition for a declaratory judgment, requesting a judgment declaring that the Essex policy at issue excludes coverage for all of plaintiffs’ claims against FDI.
 

 | sTrial commenced on February 28, 2005. Plaintiff, Edward Taaffe, testified that he and his wife entered into a contract with FDI in 1997 to have a new roof installed on their house. The house has been in Mr. Taaffe’s family for over 100 years. The contract listed the price for the work to be performed at $16,988.00. Mr. Taaffe stated that he made a $4,000.00 down payment when the contract was executed. The contract listed twenty-three items of repair to be performed by FDI. The first item on the list was “[rjeplace bad wood where needed (scab on.)” Mr. Taaffe understood that to apply to the whole house, but especially the roof. In addition to the roof work, FDI was to paint, replace gutters and repair windows, among other things.
 

 Mr. Taaffe testified that FDI started the work soon after the contract was signed. He said the work started out fine, but when the roofing materials were brought to the house, the FDI workers dropped the materials off in the middle of the landscaping, causing damage to the landscaping. He said the workers caused extensive damage to his house, trees and landscaping when they removed the existing roof. He said the damages included gouges in aluminum siding down to the wood, torn awnings and broken wrought iron work.
 

 Mr. Taaffe said the old roof was not removed in the manner in which Mr. Cas-sell told him it would be. He said debris from the old roof stayed in his yard for months. Mr. Taaffe identified photographs of the damage, which were introduced into evidence. He testified that he called Mr. Cassell to complain about the damage, and was told that the damage would be fixed and that the workers’ pactions causing the damage would not be repeated. He said as a precaution, he covered his air conditioning unit with a piece of plywood. Mr. Taaffe said that the day after his phone conversation with Mr. Cassell about the damage caused by FDI workers, he returned to the house to find that the workers had moved the plywood off of the air conditioning unit and the unit had nails and roof slates in it. His garage also had wood knocked off of it from the roofing materials. He said there was additional damage to his landscaping and siding on the second day. He again called Mr. Cassell to complain.
 

 Mr. Taaffe said that when the FDI workers finished tearing off the old roof, they only had enough materials on his property to partially complete the new roof. He said it took ten more days to get the materials to complete the roof, and rainstorms that occurred in the interim period resulted in water leaking into the house, causing further damage. Mr. Taaffe said he also was not pleased with the work FDI performed on the awnings and windows.
 

 According to Mr. Taaffe, the new roof was eventually put on the house, but he
 
 *565
 
 was not pleased with the result. He said the roof was wavy, which was not the case with the old roof. He was told by Mr. Cassell that the problem would be corrected, but it was not. Photographs of the completed roof were identified by Mr. Taaffe and introduced into evidence. Mr. Taaffe said FDI attempted to repair the damage its workers had done to the house when the old roof was torn off, but the work was not performed to his satisfaction. He said FDI did not offer to repair |sthe landscaping. He said FDI did not repair the waves in the roof, and that he intends to have another roofing company do the job correctly.
 

 On cross-examination, Mr. Taaffe stated that he was not present during the performance of the work by FDI because he was at work. He reviewed his contract with FDI, and admitted that it did not mention caulking or glazing of windows, repair of the mechanics of the windows, replacement of screens or repair and reinstallation of awnings. He said he was told by the painter that the awnings needed to be removed to paint the house. He acknowledged that despite his dissatisfaction with the job, he received a new roof, gutters and shutters, and the columns, awnings and windows were painted. He admitted that $12,988.00 is still owed under the contract.
 

 Mr. Charles Ruffino, Jr. was accepted as an expert in the field of real estate appraisal and construction. He was hired to perform an inspection of plaintiffs’ house within six months of the new roof being installed on the house. This inspection occurred in 1998. Mr. Taaffe asked Mr. Ruffino for an estimate of the cost to make his property whole again, including cleaning up the damage done by FDI. His estimate at that time for repairing the damage and redoing work that FDI did not perform properly, exclusive of the roof, was $15,970.00. He said the damage to the siding and awnings was so extensive that those items were not repairable and would have to be replaced. Mr. Ruffino stated at trial that there has been a 33% to 40% increase in reproduction costs since he arrived at his estimate |fiin 1998. His opinion was that the work performed by FDI on the house was not performed in a workmanlike fashion.
 

 The next witness was Roy Gross, III, who was accepted as an expert in the field of contracting. He was hired by plaintiff to inspect the roof that was installed on plaintiffs’ house by FDI. He submitted a report of his findings, which was introduced into evidence. His opinion is that the metal roof is defectively installed because it was installed over the existing substructure or substrate without the substructure first being leveled. He observed deflections in the roof that were the result of the roof being installed on an unlevel substructure. He explained that a deflection is a sagging of the roof structure from end to end. Mr. Gross also testified that it is his opinion that the base flashing was defectively installed because the joints were not riveted or caulked. He said there is no way to repair the problems with this roof other than removing the entire roof and starting over with a level substructure. He estimates the cost of replacing the roof at approximately $5,000.00 to $10,000.00, depending on the type of materials used.
 

 On cross-examination, Mr. Gross stated that he inspected plaintiffs’ roof in 2004. He did not know when the roof was installed. He also did not know the condition of the roof from the time it was installed until his inspection in 2004. Mr. Gross did not know if the roof had any damages or modification between the time it was installed and his inspection. He admitted that the contract between plaintiffs and FDI did
 
 *566
 
 not include removal of the existing substrate prior to installation. However, he said the problem with the roof could have been resolved |7by putting a new plywood substrate over the existing substrate. His opinion is that FDI did not cause the deflection in the roof; the deflection likely-existed prior to the installation of the new roof. Mr. Gross said the deflection does not affect the structural integrity of the roof, but it affects the appearance.
 

 Paul Lacinak, the owner and general manager of FDI, was the next witness. Mr. Lacinak explained to the court the type of roofing system installed by FDI on plaintiffs’ house. He said that Alan Cas-sell, the FDI salesperson who dealt with plaintiffs, no longer works for FDI. He said that subcontractors performed the roofing installation and other repairs on plaintiffs’ house. The roofing subcontractor was not supervised by FDI, and FDI did not supply the tools for the job. FDI paid the roofing subcontractor at the end of the job, but did not pay the salaries of the roofer’s employees, and was not involved in the hiring or firing of those employees.
 

 He said, to his knowledge, plaintiffs were never told that the substrate on their roof would be replaced prior to the installation of the new roof. Mr. Lacinak said he had only one conversation with Mr. Taaffe when he was called by the painter working on plaintiffs’ house and asked to come to the site to resolve an issue with Mr. Taaffe. He met with Mr. Taaffe, and was then told by Mr. Taaffe to get off of his property or the sheriffs office would be called. He and Mr. Taaffe had no other conversations.
 

 When he arrived at Mr. Taaffe’s house on the day the painter called, Mr. Lacinak said he inspected the job and the work appeared to be satisfactory to him. |sOn the subject of Mr. Taaffe’s complaints, Mr. Lacinak told him, “[wjhatever needs to be done would be taken care of.” He inspected the repairs made in connection with damages to the property during the roofing process, and he stated that the repairs looked good to him. He said all of the work listed in the contract was completed, but FDI has only received $4,000.00 from plaintiffs, with the balance still unpaid. Mr. Lacinak testified that $12,988.00 is still due and owing on the contract between plaintiffs and FDI, and that is the basis for the reconventional demand filed by FDI against plaintiffs. He said the plaintiffs’ roof has a lifetime of ownership labor warranty. He also said the photographs of the property introduced into evidence do not depict the condition of the property at the time he inspected the job after it was completed.
 

 Keith Munson, a claims adjuster for GAJ3 Robbins, was hired by FDI to assess the damage to the plaintiffs’ home. He inspected the home on June 13, 2000. Mr. Munson prepared a written report, which was offered into evidence. He assessed the total damages to the property at $3,322.39. He disagreed with the non-roofing damage estimate of $15,970.00 offered by Mr. Ruffino. He allowed no damage evaluation for the roof, because it looked fine to him. He also admitted that he was not asked to evaluate the roof. Mr. Munson noticed deflections in the roof when he inspected the property. His estimate did not address damages to landscaping. He also did not address dents in the siding because he assumed they were caused by a hail storm in 2000. He said his estimate would be higher if the | ¡¡damage to the siding pre-existed the 2000 hail storm because the appraisal would include removal and replacement of the siding.
 

 The last witness was Timi Taaffe, wife of Edward Taaffe. She testified that she
 
 *567
 
 took the photographs of the property introduced into evidence by plaintiffs. She said the photographs were taken throughout the job and right after the job in 1997 and 1998, well before the January 2000 hailstorm. She stated that the damages reflected in those photographs were the consequence of work performed by FDI.
 

 On May 4, 2005, the trial court rendered judgment in favor of plaintiffs and against FDI in the amount of $23,899.50 plus legal interest from date of judicial demand and all costs of the proceedings. The judgment also ordered that the policy of insurance issued by Essex provides coverage to FDI for this matter. Motions for new trial were filed by Essex, FDI and Paul Laci-nak. The motions filed on behalf of FDI and Lacinak were denied, but the motion for new trial was granted as to Essex on the issue of coverage. The trial court subsequently amended the judgment of May 4, 2005, deleting that portion finding that Essex provided insurance coverage to FDI for this matter, and dismissing FDI’s claims against Essex.
 

 In reasons for judgment, the trial court acknowledged that the roof installed by FDI is structurally sound and does not leak. However, the court also noted that the “wavy” appearance of the new roof as complained of by plaintiffs is due to the fact that the substrate upon which the new roof was placed is uneven. FDI argues |inthat the substrate was in that condition when the work began and its contract with plaintiffs did not include removal of the substrate.
 

 The court stated that the contract includes the phrase “remove bad wood where necessary (scab on),” and that the court is required to determine the intent of the parties when a contract is unclear or ambiguous in its meaning as in the instant case. The court interpreted the addition of the words “scab on” to mean that additional support to the substrate was contemplated in the scope of the work intended by the parties in order to avoid the unsightly appearance of the new roof. Thus, the court found that corrections to the substrate were included in the scope of-work to be performed by FDI under the contract.
 

 The trial court next addressed FDI’s allegation that plaintiffs have failed to carry their burden of proving breach of contract or defectivé workmanship -because the roof is only aesthetically unappealing or, alternatively, that their obligation, in the event of a finding of poor workmanship or defects, is repair, not replacement of the roof. The court cited cases holding that a “wavy appearance” of a roof cbnsti-tuted a defect in the workmanship requiring replacement of the roof, and that the loss by reason 'of aesthetic value, although the deviation did not- negatively affect the construction or harm the home structurally, was a compensable item of damages.
 

 The court found that the repair necessary to correct the “wavy” or wrinkled appearance of the -roof is to remove it, repair the substrate and replace the roof. The court noted that the only testimony on the cost to replace the roof came from |nMr. Gross who set the cost of that item at $10,000.00. The remaining items for which plaintiffs seek damages due to poor workmanship were estimated-by Mr. Mun-son, who estimated a cost of $3,322.39 to clean the attic, replace the gutters and damaged aluminum-shutters and paint and clean the bedroom carpet. Mr. Ruffino estimated costs for items not considered by Mr. Munson including replacement of damaged landscaping, building of a chute to remove debris from the attic, repairs to the damaged air conditioning unit and replacement of awnings for a total of $3,025.00. Mr. Ruffino estimates the total cost for the items of damages considered
 
 *568
 
 by Mr. Munson, but excluding the roof replacement, at $15,970.00, with $12,845.00 of that amount representing replacement costs of awnings, windows and painting. The court found that since the plaintiffs should not be unjustly enriched by the inclusion of new vinyl siding and gutters, windows and certain other items in Mr. Ruffino’s estimate, the court deducted 30% from the Ruffino estimate.
 

 The trial court stated that it was awarding plaintiff damages for pecuniary loss of $10,000.00 for roof replacement and $8,991.50 for additional defective work. The court awarded an additional $5,000.00 in damages for non-pecuniary losses for the defective work of FDI, for a total award of $23,889.50. The court stated that it did not award the return of the $4,000.00 deposit paid by plaintiffs to FDI based on its finding that the roof materials provided by FDI may be used in the replacement of the roof.
 

 |12FDI now appeals. On appeal, FDI first argues that the trial court erred in disregarding the language of the contract as to the work contemplated to search for the parties’ intent. Citing La. C.C. article 2046, FDI- argues that the words of the contract are clear and explicit, and therefore, the court erred in looking to the intent of the parties for further interpretation. FDI argues that the provision for replacement of “bad wood where necessary” did not contemplate replacement of the substrate as it was not made out of bad wood. In determining that additional support to the substrate was contemplated in the scope of the work, the trial court relied on the fact that the words “scab on” were added after the provision for the replacement of “bad wood where necessary.” We find no error in the trial court’s finding that this section of the contract was ambiguous, and that the addition of the words “scab on” shows that the parties contemplated additional support to the substrate in order to avoid the appearance of an unsightly roof. This assignment of error is without merit.
 

 In the next assignment of error, FDI argues that the trial court erred in failing to mention in its judgment or reasons the unpaid balance of the contract between plaintiff and FDI. It is undisputed that plaintiff paid only $4,000.00 to FDI, and that the contract price totaled $16,988.00, leaving an unpaid balance of $12,988.00. The trial court’s findings that corrections to the substrate were included in the scope of work to be performed by FDI under the contract, and that the only way to correct the “wavy” appearance of the roof caused by FDI’s defective workmanship is to remove the roof, repair the substrate and replace the roof, establish that the 11gcourt found that the value plaintiffs received from their contract with FDI did not exceed the $4,000.00 payment already made to FDI. Because there is support in the record for the trial court’s conclusions, we find no error in the trial court’s failure to allow a credit to FDI for the unpaid balance of the contract.
 

 FDI next argues that the plaintiffs failed to meet their burden of proving the existence of defects in FDI’s workmanship. An owner seeking to recover from a contractor for defective workmanship bears the burden of proving the existence and nature of the defects and that the defects were due to faulty materials or workmanship.
 
 Hernandez v. Martinez,
 
 2000-1282 (La.App. 5 Cir. 2/28/01), 781 So.2d 815, 821; La. C.C. article 2769. In this matter, the plaintiff presented evidence establishing that FDI’s installation of a new roof over an uneven substrate and the resulting “wavy” appearance of the roof constituted defective workmanship. Although FDI presented testimony contradicting plaintiffs’ claim of defective
 
 *569
 
 workmanship, the trial court’s decision to accept the evidence presented in support of plaintiffs’ claim was not an abuse of discretion. This assignment of error is without merit.
 

 FDI also argues that the credibility of FDI’s expert witnesses outweighed that of plaintiffs’ expert witnesses. The trial court was in the best position to evaluate the credibility of the witnesses, and rendered judgment based on its conclusions. We do not find that the credibility determinations of the trial court were unreasonable. We find no merit in this assignment of error.
 

 | UFDI next argues that the trial court erred in awarding damages for replacement, rather than repair, and in awarding damages for non-pecuniary losses in this case. The standard for reviewing the award of damages for breach of contract is whether the trial court abused its discretion.
 
 Hernandez v. Martinez, supra.
 
 The record in this case includes evidence supporting the damages awarded by the trial court for pecuniary and non-pecuniary losses. Accordingly, we cannot say that the trial court abused its discretion in the award of damages.
 

 Finally, FDI argues that the trial court erred in failing to accept evidence of damage to plaintiffs’ home allegedly caused by a hail storm in January 2000. At trial, FDI attempted to introduce evidence of the hail storm to show that the inspection by plaintiffs roofing expert, Roy Gross, III, occurred after the hail storm and did not account for the possibility that some of the damage to plaintiffs’ property was caused by that storm. FDI was not allowed to question Mr. Gross about the possibility that the source of the damage was related to the hail storm and the plaintiffs’ insurer’s actions following the hail storm. FDI notes that its expert, Keith Munson, also inspected the property after the 2000 hail storm, and attributed much of the damage to the property to the hail storm. The court disallowed evidence relating to the hail storm, but allowed FDI to proffer the evidence.
 

 The plaintiffs presented sufficient evidence to show that the damages to their property were caused during the time period that FDI worked on the house. In addition to the photographs taken right after the job was finished in late 1997 or early 1998, the evidence also included the expert witness testimony of Mr. Charles lisRuffino, Jr., who inspected the property in 1998, well before the 2000 hail storm. He concluded that the work performed by FDI was not done in a workmanlike fashion. Therefore, any error in not allowing evidence regarding any damage caused to the property by the 2000 hail storm was harmless because of the other evidence in the record regarding the condition of the property prior to the hail storm. This assignment is without merit.
 

 FDI also alleges as error the trial court’s decision that the Essex insurance policy carried by FDI did not provide coverage for the judgment rendered against FDI in this matter. Although the trial transcript shows that counsel for Essex introduced a certified copy of the policy into evidence without objection, the appeal record does not include a copy of the insurance policy at issue. As a court of record, we cannot review FDI’s claims regarding insurance policy coverage when the policy is not in the record before us. Without this evidence, we cannot say the trial court erred in its finding that the Essex policy did not provide coverage in this matter.
 

 For the reasons stated above, we affirm the trial court judgment.
 

 AFFIRMED.
 

 [1]
 

 . Defendants Paul Lacinak and Alan Cassell were not cast in judgment in this case. FDI states in its brief that Mr. Lacinak was dismissed from this lawsuit, and that Mr. Cassell was never served with plaintiffs’ petition. The appeal record does not contain the dismissal of defendant Lacinak.