| LAKEFRONT MANAGEMENT AUTHORITY | * | NO. 2025-CA-0324 |
| | * | COURT OF APPEAL |
| VERSUS | * | FOURTH CIRCUIT |
| J & J PARTNERS, L.L.C. | * | STATE OF LOUISIANA |

\* \* \* \* \* \* \*

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2020-08075, DIVISION "F-14"
Honorable Jennifer M Medley,
\* \* \* \* \* \*
**Judge Rachael D. Johnson**
\* \* \* \* \* \*
(Court composed of Judge Joy Cossich Lobrano, Judge Rachael D. Johnson, Judge Karen K. Herman)

**LOBRANO, J., CONCURS IN THE RESULT**

David Jefferson Dye
DAVID JEFFERSON DYE, L.L.C.
1415 Esplanade Avenue
New Orleans, LA 70116

Al J. Robert, Jr.
AL J. ROBERT, JR., LLC
650 Poydras Street
Suite 2828
New Orleans, LA 70130


COUNSEL FOR PLAINTIFF/APPELLANT


Joseph R. Ward, Jr.
WARD & CONDREY, LLC
438 S New Hampshire St.
Covington, LA 70433

Randy George McKee
MCKEE LAW FIRM, LLC
1100 Poydras Street
Suite 1475

New Orleans, LA 70163

Robert Joseph Daigre
BURGOS & ASSOCIATES, L.L.C.
3535 Canal Street
New Orleans, LA 70119

COUNSEL FOR DEFENDANT/APPELLEE

**NO RIGHT OF ACTION EXCEPTION OVERRULED;**
**AFFIRMED IN PART;**
**REVERSED IN PART;**
**REMANDED IN PART**
**FEBRUARY 13, 2026**

*RDJ*

*KKH*

Appellant/Defendant-in-Reconvention, Lakefront Management Authority (LMA), seeks review of the March 13, 2025 district court judgment finding LMA liable to Appellee/Plaintiff-in-Reconvention, J & J Partners, LLC (J & J) for breach of contract, fraud, and inverse condemnation. In addition, LMA filed an exception of no right of action with this Court. We overrule LMA's exception of no right of action, affirm the district court's finding on J & J's claim of breach of contract, reverse the district court's finding on J & J's claims of fraud and inverse condemnation, and remand this matter to the district court for further proceedings consistent with this opinion.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

This Court efficiently summarized the facts of this case in *Lakefront Management Authority v. J & J Partners, L.L.C.*:

On November 4, 1994, J & J Partners, represented by John Dane, entered into a 25-year lease with the former Board of Commissioners of the Orleans Levee District for the property with the municipal address of 7412 Lakeshore Drive in New Orleans, Louisiana and located along the New Basin Canal. Concerning the term of the lease, paragraph 2 provides:

This lease is for a term of twenty-five (25) years beginning on August 1, 1994 and ending on July 31, 2019. Further, provided lessee shall spend the sum of

1

FIVE HUNDRED THOUSAND DOLLARS ($500,000.00) for permanent improvements located on the property, the term of the lease shall be extended an additional twenty-five years from July 31, 2019.

The leased premises (where there was a 60 + year old metal building) were initially used as an office building. In 1999, the management and ownership of J & J Partners was assumed by Frank D'Amico, Jr. The property suffered severe damage during Hurricane Katrina in 2005. Not only was the building condemned by the City of New Orleans, but the City also blocked access to this property and others located along the New Basin Canal. J & J Partners continued to pay rent during this time.

The lease agreement provides that if the lessee intends to rebuild the premises after they are damaged by "fire, the elements, unavoidable accident or other casualty" then re-construction must be "vigorously pursued." After having the Katrina damages estimated by his insurer, Mr. D'Amico decided to rebuild. Mr. D'Amico approached the LMA about getting the appropriate approval as required by paragraph 9 of the lease agreement, but was told that the agency was overwhelmed by other property loss issues and he was free to rebuild as he saw fit. After obtaining the proper permits from the City, Mr. D'Amico proceeded to rebuild and re-purpose the building and the adjacent open space as an event venue. Mr. D'Amico estimated that he spent over $800,000.00 on improvements to the property; these included rebuilding the foundation piers, rebuilding the interior of the building (from the shell), and rebuilding the courtyard area.

Management and control of J & J Partners was assumed by Cesar Burgos in July of 2015. In connection with his purchase of J & J Partners, Mr. Burgos obtained a 20[-]year mortgage from FNBC Bank. The bank had the property appraised and it was valued at $910,000.00. The bank reviewed the documentation evidencing expenses made and was satisfied that over $500,000.00 in permanent improvements had been made to the property. Between 2016 and 2018, Mr. Burgos continued to operate the premises as an event venue and made additional permanent improvements to the property in an amount exceeding $200,000.00.

In 2018, FNBC was placed into receivership and Mr. Burgos needed to refinance his mortgage loan. In connection with his refinance loan request, Hancock Whitney obtained an appraisal of the property, which established a fair market value of $1,300,000.00. Hancock Whitney approved the loan but requested some acknowledgement from the LMA that the lease was extended for the second 25[-]year term. In October of 2018, J & J Partners requested that the LMA acknowledge that the lease term had been extended 25 years pursuant to paragraph 2 of the lease agreement. On October 17, 2018, the LMA

indicated that J & J Partners was required to make a formal request for the extension and added that it would have to be board approved. Mr. Burgos submitted a formal letter dated November 16, 2018. On November 26, 2018, the LMA had an appraisal on the subject property done in part to address the "highest and best use" for the property.

In February of 2019, the LMA's legal counsel advised Mr. Burgos that "permanent improvements" did not include " ... repairs or replacement of systems in the building, such as replacement of an HVAC system, and also do not include repairs made to the buildings after hurricanes, such as Katrina ..."[1] Mr. Burgos belied that this interpretation was wrong and not supported by the plain language of the lease agreement. J & J Partners provided documentation including cancelled checks and invoices along with explanations from Mr. D'Amico, Mr. Burgos and Mr. Burgos' personal assistant, Lee Jin Danielson, backing up the materials supplied. On April 15, 2019, the LMA stated from its initial review it agreed only $88,183.00 was expended on permanent improvements, but $859,539.72 was stated to be "undetermined." On June 27, 2019, the LMA changed its opinion to state that it agreed $170,046.75 were made in permanent improvements, while $778,733.41 remained "undetermined." Later, at a public meeting, it was revealed by the chairwoman of the LMA, Wilma Heaton, the LMA had determined that $460,000.00 had been made in permanent improvements. This was confirmed by the LMA's long-time real estate consultant, Albert Papalardo.

Although some further discussions took place between the parties, they were unable to agree that the lease had been extended to the second term or a new lease. Thereafter, the LMA brought a summary proceeding for possession and to evict against J & J Partners.[2] J & J filed a verified answer and a reconventional demand,[3] which the trial court did not address.

---

[1] LMA's legal counsel further stated that "Permanent improvements are those permanently attached to the land that will remain indefinitely and become an integral part of the property." This definition was not in the lease agreement and was not provided to J & J Partners until February 2019, via email.

[2] At the September 2020 meeting, an LMA member motioned to amend the meeting schedule, which was approved. Then, the LMA Vice Chair offered a motion to amend the schedule to authorize the institution of legal proceedings to evict J & J from the property and to institute any other legal action necessary to obtain possession of the property. LMA made a call for public comment before voting on the motion at that same meeting. Nobody approached the Board to make a comment. LMA unanimously approved the motion.

[3] J & J Partners' reconventional demand included claims for breach of contract, fraud, and inverse condemnation. LMA's ambiguity as to whether it would extend the lease resulted in J & J Partners booking fewer events, since events must be booked months to even more than a year in advance. Mr. Burgos informed LMA via email in August 2019 that "[t]his issue [of the lease extension] has put a stop to our business and is affecting us." He reiterated this in January 2020, saying "I am being damaged . . . this situation is extremely damaging to my business."

A hearing took place over the period of January 13-20, 2021. At the hearing, J & J Partners presented two experts, a CPA (Lori Leal) and an architect (John Williams) to provide evidence as to how the term "permanent improvement" is defined in accounting and commercial real estate development and construction. The CPA and the architect also opined on whether the documentation provided proved that J & J Partners had met the $500,000.00 threshold. Contrary to LMA's expert, these two experts reviewed the documentation, questioned Mr. D'Amico and Mr. Burgos about the expenditures and each inspected the premises before rendering any opinion. The LMA's expert architect Paul Dimitrios never visited the site and also gave conflicting valuations of the permanent improvements made; he initially found only $87,000 in permanent improvements, but in a later email to the LMA board president he conceded that the figure was around $460,000.00. He testified that he actually agreed with his initial estimate.

On February 1, 2021, the trial court rendered judgment denying the petition for possession and the rule to evict accompanied by written reasons.

2021-0102, pp. 1-5 (La. App. 4 Cir. 11/10/21), 331 So. 3d 434, 435-37.

In its reasons for judgment, the district court found that J & J had met and "most likely far exceeded" the $500,000 threshold, but that LMA avoided acknowledging this due to its desire to have the property "redeveloped into what they considered a higher and better use."

LMA appealed. This Court affirmed the judgment of the trial court on November 20, 2021;[4] LMA's Writ Application with the Louisiana Supreme Court was denied on February 22, 2022.[5]

A five-day trial was held in July 2024 on J & J's reconventional demand. The district court found that LMA was liable to J & J for breach of contract, fraud, and inverse condemnation. LMA appealed.

---

[4] *Lakefront Mgmt. Auth.*, 2021-0102 at p. 9, 331 So. 3d at 439.
[5] *Lakefront Mgmt. Auth.*, 2021-01855, p. 1 (La. 2/15/22), *writ denied*, 332 So. 3d 1188.

## ASSIGNMENTS OF ERROR

LMA submits four assignments of error on appeal:

1. The district court erred by holding that LMA breached the Lease Agreement's warranty of peaceful possession where the LMA's only action was filing an eviction proceeding, where no express repudiation took place, and where the district court found that J & J remained in possession of the leased premises.

2. The district court erred by finding fraud where there was no evidence of a material misrepresentation or justifiable reliance, and fraud claims based on unfulfilled promises require proof of intent not to perform at the time the promise was made.

3. The district court erred in awarding inverse condemnation damages and attorney fees under La. R.S. 13:5111 where the claim arose from a commercial lease, not a statutory or constitutional taking, and there was no deprivation of economic use.

4. The district court erred in awarding damages for lost profits to J & J based upon a speculative proforma where the alleged damages belong to nonparty entities that own and operate the events venue business on the leased premises.

## STANDARD OF REVIEW

This Court has previously held that "[a] trier of fact's factual conclusions respecting a breach of contract claim are governed by the manifest error or clearly wrong standard of review." *IV Waste, LLC v. Jim Hotard Properties, LLC*, 2023-0610, p. 17 (La. App. 4 Cir. 9/17/24), 400 So. 3d 1008, 1021 (quoting *Brenner v. Zaleski*, 2014-1323, p. 3 (La. App. 4 Cir. 6/3/15), 174 So. 3d 76, 79). "The

5

standard of review for a damage award for breach of contract is whether the trial court abused its discretion." *Stallings Const. Co. v. Klein Steel, Inc.*, 2012-1482, pp. 3-4 (La. App. 4 Cir. 3/27/13), 112 So. 3d 389, 392 (citing *Taaffe v. Factory Direct Installations, Ltd.*, 2008-0175, p. 14 (La. App. 4 Cir. 4/15/09), 13 So. 3d 562, 569).

"The existence of fraud is a question of fact; thus the trial court's determination of fraud or its absence is subject to the manifest error standard of review on appeal." *River Rental Tools, Inc. v. Smith Power Solutions, LLC*, 2021-0716, p. 4 (La. App. 4 Cir. 6/15/22), 342 So. 3d 1052, 1056 (citing *Monroe v. McDaniel*, 2016-0214, p. 8 (La. App. 5 Cir. 12/07/16), 207 So. 3d 1172, 1178).

Whether a constitutional taking has occurred in the context of a contractual dispute is a question of law and is thus subject to *de novo* review. *See Sarpy v. ESAD, Inc.*, 2007-0347, p. 4 (La. App. 4 Cir. 9/19/07), 968 So. 2d 736, 738 (citing *La. Mun. Ass'n v. State*, 2004-0227, p. 35 (La. 1/19/05), 893 So. 2d 809, 836) ("Questions of law are reviewed under the *de novo* standard.").

**DISCUSSION**

We will address the fourth Assignment of Error, the exception of no right of action, before addressing the other assignments of error. The determination of this exception has the potential to dispose of all other substantive claims.

Exception of No Right of Action

LMA asserts on appeal that J & J cannot recover lost business profits belonging to 7412 Lakeshore Drive, LLC and La Maison du Lac, LLC, non-parties to the case *sub judice*. LMA argues that the business licenses, bank accounts, contracts, payroll accounts, receipts, and tax filings for the event venue business underlying the litigated claims belonged to entities other than J & J Partners; as

6

such, profits that the operator LLCs earned belong to their separate patrimonies, not J & J's.

J & J argues that LMA has raised this exception too late. We disagree. Louisiana Code of Civil Procedure article 2163(A) provides that a party can raise an exception of no right of action for the first time in an appellate court if the exception is pleaded prior to submission of the case for decision and if proof of the grounds of the exception appears in the record.

Nevertheless, this Court overrules LMA's exception of no right of action. The Louisiana Supreme Court has explained the function of the peremptory exception of no right of action:

> The function of an exception of no right of action is to determine whether plaintiff belongs to the class of persons to whom the law grants the cause of action asserted in the petition. La.Code Civ.P. art. 927; *Dering v. Dering, 21-691* (La. 10/1/21), 324 So.3d 1042 (citing *Turner v. Busby*, 03-3444 (La. 9/9/04), 883 So.2d 412). The exception of no right of action serves to question whether the plaintiff in the particular case is a member of the class of persons that has a legal interest in the subject matter of the litigation. *Id.*

*Pickett v. Pickett*, 2023-01374, p. 1 (La. 11/15/23), 373 So. 3d 49, 50 (Mem). We find that as a lessee, J & J has the right to bring a breach of contract action for its lessor's, LMA's, refusal to adhere to the terms of their lease agreement. The district court and this Court have previously found that J & J fulfilled the requisite suspensive condition outlined in the contract, yet LMA refused to acknowledge the lease extension.

The question of whether and precisely how much LMA owes J & J in damages is a separate issue from J & J's right to bring a breach of contract claim. As such, that issue will be addressed below.

7

Breach of Contract

Both times these parties came before the district court on these facts, the district court found that J & J expended over $500,000 in permanent improvements. This Court previously upheld that finding.[6] Therefore, pursuant to the terms of the lease agreement, the lease should have renewed for another 25 years. LMA breached the lease agreement by failing to acknowledge the lease extension and filing eviction proceedings against J & J.

The district court found that LMA filing a Petition for Possession and Rule to Evict on September 25, 2020 constituted an anticipatory breach of the lessor's obligation to ensure the lessee's peaceful possession for the duration of the lease.[7] The district court reasoned that "[a] lessor who fails to meet his or her obligations under the provisions of La. C.C. art. 2682 by wrongfully dispossessing the lessee of the premises is generally liable for any resulting damages." *See Duhon v. Briley*, 2011-1137, p. 5 (La. App. 4 Cir. 5/23/13), 117 So. 3d 253, 258.

Although this Court indeed finds that LMA breached the lease agreement, we reach this conclusion based on different reasoning. While the district court relied on the general obligation of lessors to warrant peaceful possession through the duration of the lease, we instead rely on the specific terms of the lease agreement between the parties.

---

[6] *See Lakefront Mgmt. Auth.*, 2021-0102 at p. 7, 331 So. 3d at 439.

[7] According to Louisiana Civil Code article 2682, a lessor's principal obligations to a lessee are: (1) to deliver the thing leased to the lessee; (2) to maintain the thing leased in a condition suitable for the purpose of which it was leased and **(3) to protect the lessee's peaceful possession for the duration of the lease.** (Emphasis added).

8

The district court reasoned that LMA breached the lease agreement when it took "physical acts"[8] to throw obstacles in the way of J & J enjoying its possession of the property. Those physical acts included requiring J & J to submit a formal written request to the Board for approval, and for the lease/extension to be adopted via resolution; requiring an appraisal to be performed; including a "best and highest use" evaluation in the appraisal; instructing Mr. Burgos that issuance of permits did not amount to approval of lease extension; implying that Mr. Burgos would have to sign an entirely new lease; retaining an outside architect without the knowledge of J & J and giving the architect a new definition of "permanent improvements."

On appeal, LMA rejects the district court's reasoning that "physical acts" are any acts which hinder a lessee's enjoyment. Rather, LMA argues that the term "physical acts" per La. C.C.P. art. 3659(B) is limited to corporeal interference; that the acts referenced above are administrative acts rather than physical acts constituting a disturbance in fact; and that because LMA never physically dispossessed J & J nor denied J & J use of the premises, it never committed a disturbance in fact. Likewise, LMA argues that the filing of a Petition for Possession and Rule to Evict does not amount to disturbance of J & J's peaceful possession.

It is not necessary to determine whether those administrative acts amount to "physical acts" pursuant to La. C.C.P. art. 3659(B). Arguments rooted in the

---

[8] Per Louisiana Code of Civil Procedure article 3659(A)-(B), a disturbance of possession which gives rise to a possessory action is either a disturbance in fact or a disturbance in law. "A disturbance in fact is an eviction, or **any other physical act** that prevents the possessor of immovable property or of a real right therein from enjoying his possession quietly, or that throws any obstacle in the way of that enjoyment." (Emphasis added).

9

general obligations of lessors are superfluous and distract from the essence of the litigation at hand. We need only look to the lease agreement itself to recognize that breach has occurred.

LMA breached the contract when it did not recognize J & J's lease extension, regardless of whether its acts would be considered "physical acts" under La. C.C.P. art. 3659(B). In this same vein, though LMA is correct that filing a Petition for Possession and Rule to Evict does not itself amount to a disturbance of J & J's peaceful possession,[9] it still shows that LMA did not respect the terms and conditions of the lease it entered in 1994. As J & J demonstrated to both the district court and this Court, it fulfilled the suspensive condition of expending $500,000 in permanent improvements. Consequently, J & J was entitled to the lease extension. In not recognizing the extension and instead filing a Petition for Possession and Rule to Evict, we find that LMA breached the lease.

We affirm the district court's finding that J & J's claim against LMA for breach of contract has merit. The question of quantum of damages for breach of contract shall be remanded to the district court. In calculating the damages, the district court should consider which damages belong to J & J as a lessee and the only party to this litigation.

Fraud

Louisiana Civil Code article 1953 defines "fraud" as "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other." This

---

[9] *See Horizon River Rests., LLC v. West Centro, LLC*, 2018-0412, p. 10 (La. App. 4 Cir. 1/23/19), 318 So. 3d 848, 855 (quoting *Constantin Land Tr. v. Pitre Indus., LLC*, 2016-0993, p. 5 (La. App. 1 Cir. 7/10/17), 225 So. 3d 1089, 1093) ("an [eviction] action or proceeding filed adversely to a possessor . . . is not a disturbance [of the lessee's peaceful possession].").

Court has noted that "the two essential elements of fraud are the intent to defraud or gain an unfair advantage and actual or probable damage." *McGaha v. Franklin Homes, Inc.*, 2021-0244, p. 37 (La. App. 4 Cir. 2/4/22), 335 So. 3d 842, 865 (quoting *Yi-Zarn Wang v. Boudreaux*, 2020-0249, p. 12 (La. App. 4 Cir. 1/15/20), 310 So. 3d 730, 738). The essential elements of "intentional misrepresentation" are: (1) a misrepresentation of material fact, (2) made with the intent to deceive, (3) causing justifiable reliance with resulting injury. *Id.* (quoting *Sys. Eng'g & Sec., Inc., v. Sci. & Eng'g Ass'ns, Inc.*, 2006-0974, p. 3 (La. App. 4 Cir. 6/20/07), 962 So. 2d 1089, 1091).

The district court characterized the lease between the parties as the "material facts" and found that LMA made material misrepresentations about the requirements of the lease in order to secure an "unjust advantage," namely, to secure a new lease which LMA felt exercised a "higher and better use" of the property. The district court reasoned that these misrepresentations reasonably led to J & J justifiably relying on the fact that LMA would not honor the terms of the lease, resulting in substantial loss to J & J by way of lost profits. Thus, the district court found LMA liable for fraud against J & J for all of the material misrepresentations the LMA made and imposed on J & J in renewing and extending the lease at issue.

We find that the district court was manifestly erroneous in finding that LMA's actions rose to the level of fraud. It appears it is more accurate to characterize the aforesaid actions as indication of disagreement between the parties about the necessary procedure for extending the lease. J & J did not show that LMA's actions involved the requisite level of deceit to be considered fraudulent. LMA going against the plain terms of the lease and trying to make J & J jump

11

through various administrative hoops for the lease extension is a breach of contract issue, but it is not in itself fraudulent. We reverse the district court's finding that LMA is liable for fraud. We do not find that LMA's actions throughout the lease extension process/negotiations amount to fraud.

Inverse Condemnation

The Louisiana Supreme Court set forth a three-prong analysis to determine whether a claimant is entitled to compensation for a constitutional taking: (1) a recognized species of property right has been affected; (2) the property has been taken or damaged in a constitutional sense; and (3) the taking or damaging was for a public purpose under Article I, Section 4 of the Louisiana Constitution.[10]

> This Court has clarified the purpose of an inverse condemnation claim:
>
> The purpose of an inverse condemnation claim is to provide a procedural remedy for an owner who seeks compensation for a taking that has happened to their land by a government or private entity. *Faulk v. Union Pac. R.R. Co.*, 2014-1598 (La. 6/30/15), 172 So. 3d 1034, 1043–44. Under the constitution, a taking is "any substantial interference with the free use and enjoyment of property." *State Through Dep't of Transp. & Dev. v. Chambers Inv. Co.*, 595 So. 2d 598, 602 (La. 1992).

*Fanny Farms, LLC v. Plaquemines Par. Gov't*, 2023-0098, pp. 11-12 (La. App. 4 Cir. 11/21/23), 377 So. 3d 838, 847. The district court's finding of inverse condemnation is an error of law subject to our *de novo* review.

We find that when LMA filed a Petition for Possession and Rule to Evict, it was acting in its contractual capacity as a commercial lessor. There is nothing in the record to support that it was acting based on a statute, regulation, or ordinance. There is no indication that it was exercising police or legislative power. Thus, this

---

[10] *State, Dep't of Transp. and Dev. v. Chambers Inv. Co.*, 595 So. 2d 598, 603 (La. 1992).

action by the LMA is outside of the scope of government action and does not trigger constitutional scrutiny.

On this point, the U.S. Fifth Circuit has explained:

> Where an alleged taking implicates government contracts . . . a successful takings claim is unlikely. A government acting "in its commercial or proprietary capacity in entering contracts, rather than in its sovereign capacity," is treated just as any other party to a contract, and contract law remedies provide the proper recourse for any wrongdoing. *Preston Hollow Cap., L.L.C. v. Cottonwood Dev. Corp.*, 23 F.4th 550, 553 (5th Cir. 2022) (quoting *Hughes Commc'ns Galaxy, Inc. v. United States*, 271 F.3d 1060, 1070 (Fed. Cir. 2001)). Put differently, actions "that would constitute a simple breach of contract when a non-governmental entity is involved do not become a constitutional violation simply because the contracting party is a municipality." *Id.* at 552 (quoting *Massó-Torrellas v. Mun. of Toa Alta*, 845 F.3d 461, 468 (1st Cir. 2017)).

*Mesquite Asset Recovery Group, LLC v. City of Mesquite, Tex.*, 154 F. 4th 313, 316 (5th Cir. 2025). The Court of Federal Claims has echoed this viewpoint: "When a plaintiff possesses enforceable rights under a contract with the government, 'interference with such contractual rights generally gives rise to a breach claim not a taking claim.'" *Century Exploration New Orleans, Inc. v. United States*, 103 Fed. Cl. 70, 77 (Fed. Cl. 2012) (quoting *Sun Oil Co. v. United States*, 572 F. 2d 786, 818 (Ct. Cl. 1978)).

Plaintiffs may, however, plead both a breach of contract claim and a takings claim as alternative theories of recovery when challenging the same government action. *Mesquite Asset Recovery Group, LLC*, 154 F. 4th at 317; *Century Exploration New Orleans, Inc.*, 103 Fed. Cl. at 77. A court will first assess the breach of contract claim and will examine the takings claim if the breach claim falters. *Mesquite Asset Recovery Group, LLC*, 154 F. 4th at 317.

Here, LMA acted in its capacity as a lessor when entering the 1994 lease agreement with J & J. The fact that this lessor is a governmental entity does not

13

convert the breach of contract into a Fifth Amendment violation. J & J asserted both a breach of contract claim and an inverse condemnation claim, two alternative theories of recovery. The district court should only have evaluated the inverse condemnation claim if the breach of contract claim failed. Since the breach claim succeeded, the inverse condemnation claim should have been dismissed.

Even if this was "government action" subject to constitutional scrutiny, the inverse condemnation claim fails on the second prong; J & J's property has not been "taken" in a constitutional sense. J & J argues LMA engaged in a physical constitutional taking of the property when it told J & J its lease had expired and filed a petition to evict J & J, thereby rendering the property totally useless to J & J and causing J & J significant damage.

> As this Court explained in *Fanny Farms, LLC*:
>
> An unconstitutional taking does not arise merely because the owner is unable to maximize the economic potential of their property. *State, Dep't of Soc. Servs. v. City of New Orleans*, 95-1757 (La. App. 4 Cir. 5/29/96), 676 So. 2d 149, 154. Denying one avenue of developing your property would not necessarily amount to a taking either. *Major v. Pointe Coupee Par. Police Jury*, 2007-0666 (La. App. 1 Cir. 12/21/07), 978 So. 2d 952, 957. In order for a taking to arise in this situation, the taking must require the owner to suffer a permanent invasion of its property and deprive the owner of all economically beneficial use of its property. *Faulk*, 172 So. 3d at 1057.

*Id.* at p. 13, 377 So. 3d at 847.

J & J has not illustrated that LMA's refusal to uphold the lease extension amounts to deprivation of all economically beneficial use of the property. J & J remained in possession of the property and continued to derive profit. Though the uncertainty of the lease extension meant J & J could not book events such as weddings, which must be booked well in advance, this is not the only economically beneficial use of the property.

14

At issue is a contractual dispute, not a constitutional taking. We reverse the district court's finding that J & J proved its claim for inverse condemnation as well as the associated damages and attorney fees.[11]

## CONCLUSION

J & J has demonstrated to multiple courts that it satisfied the suspensive condition in the 1994 lease. Thus, LMA should have honored the lease extension. In not doing so, LMA breached the lease agreement. J & J, as the lessee of the breached agreement, has a right to bring an action against LMA for this breach. However, we find that LMA's actions do not rise to the level of fraud. We also find that LMA was acting in its commercial/contractual capacity in entering the lease agreement and that J & J's property was not taken such that it amounted to inverse condemnation. For these reasons, we overrule LMA's exception of no right of action, affirm the finding that there was breach of contract, reverse the findings of fraud and inverse condemnation, and remand to the district court for further proceedings consistent with this opinion.

---

[11] The standard for an award of attorney fees in inverse condemnation cases is set forth in Title 13, Section 5111 of the Louisiana Revised Statutes, and reads, in pertinent part:

> A. A court of Louisiana rendering a judgment for the plaintiff, in a proceeding brought against the state of Louisiana, a parish, or municipality or other political subdivision or an agency of any of them, for compensation for the taking of property by the defendant, other than through an expropriation proceeding, shall determine and award to the plaintiff, as a part of the costs of court, such sum as will, in the opinion of the court, compensate for reasonable attorney fees actually incurred because of such proceeding.

Thus, we reverse the statutorily-mandated attorney fees alongside the reversal of the underlying inverse condemnation claim.