KLIEBERT, Chief Judge.
This is a suit by Mrs. Louis C. Guidry and her insurer, Louisiana Coastal Underwriters, for damages sustained as the result of a fire which occurred at the residence of Mrs. Guidry at Grand Isle, Louisiana, on April 11, 1988. It is alleged in the petition that as Mrs. Guidry attempted to light her natural gas-operated floor furnace the latter malfunctioned, resulting in a fire which caused extensive damage to the residence and its contents. Louisiana Coastal is alleged to have paid plaintiff the sum of $25,000.00 under her policy and here seeks recovery in subrogation. The sole defendant is the Louisiana Tin & Stove Company, Inc., manufacturer of the floor furnace.
Following trial on the merits on December 17, 1991 the trial judge ruled from the bench. He found the defendant was liable and gave his reasons for so concluding, but took under advisement the matter of the damage amount. On March 12, 1992, after reviewing the deposition of Mr. Willard Bryant, the adjuster, as well as the remainder of the record, written reasons were handed down with respect to quantum. These were reflected in the total amount of $80,736.00[1] in the formal judgment of the same day from which the defendant has appealed.
The sole issue raised by appellant is that of liability, the specification of error set forth by it being simply that there was insufficient evidence of a defect in the floor furnace which was the cause of the fire.
The plaintiff is a widow who lived alone. Her home, constructed in the late 1940’s, though modest, was of two story construction, with living quarters, bedrooms, bath and kitchen upstairs. Downstairs was the enclosed garage, tool room, laundry room, screen porch and cooking facilities for such things as frying fish and boiling crabs. The floor furnace was on the upper floor, but protruded down into the laundry room.
*1116 A floor furnace had been installed in the home when it was built and had been replaced some five years or more before the fire by one similar and in the same location with the same gas piping and thermostat. It had never given a problem. Mrs. Guidry had turned off the floor furnace a week before the occurrence of the fire, but on that day, as there was a 40 MPH wind blowing and she wanted to take a bath, she attempted to light it in order to warm the house.
Mrs. Guidry, who was over 70 years of age, testified that she had lit the floor furnace on a previous occasion and described in detail how she went about doing it this time. This included getting on her hands and knees, removing the grill, lighting the kitchen match attached to the “stick,” and pressing down on the button to light the pilot. As she turned on the pilot she “heard a noise like something explode.” She went to the sink, got a glass of water and poured it in on the floor furnace. She hastened downstairs, then where the fire had already begun and immediately sought help, first by telephone and then by calling the neighbors.
The plaintiff testified without contradiction that the furnace had never given trouble before and that she had it cleaned regularly. She was emphatic in stating that she never smelled gas around the floor furnace, either upstairs or downstairs in the laundry room, on the day of the fire or before. The “poof,” as she called it, occurred as she put the match to the bottom of the furnace and pushed the button. There were no flames which came up and burned her; rather the flame was at the bottom of the furnace and ignited the parallel wall of the laundry room immediately.
Fred H. Vanderbrook, Jr., consulting engineer specializing in determination of the cause of failure and fire origin work, testified on behalf of the plaintiffs. He had visited the scene of the fire three days after its occurrence and had prepared a report for the insurance company. He examined the floor furnace and brought the burner assembly and gas valve with him to court. He interviewed Mrs. Guidry and listened to her testimony in court. His conclusion as to the cause of the fire was that:
“when she turned the gas valve to the pilot position that, for some reason, there was a malfunction of the valve which allowed an unusual or unexpected amount of gas to come into the burner chamber. And, when she stuck the match down into the burner chamber it ignited this gas which then blew out through the opening on the side into the laundry room and ignited nearby combustible materials.”
While this witness readily admitted that he had no theory as to how the valve malfunctioned, he was emphatic in his conclusion that the valve had indeed malfunctioned, as he had considered and ruled out every other reasonable probability. The valve is a sealed unit and there would be no way for a consumer or even a plumber to find an existing defect he said.
Specifically, Mr. Vanderbrook testified that “the greatest extent of damage was at the end of the floor furnace where the gas valve was located.” He also stated that he had examined the other appliances, namely, the water heater, washer, dryer, stove, and refrigerator and the location in which they had been prior to the fire and concluded that they were not the source or cause of the fire.
Mr. George A. Hero, III, tendered as a licensed master gas fitter, trained master plumber, as well as an expert in fire cause and origin, testified on behalf of the defendant. He had examined the remains of the floor furnace on February 27, 1989 and had sent in a one page report to CNA Insurance wherein he concluded:
“No defects were found in the floor furnace itself. The most probable cause of the fire was a gas leak at the tubing connection. A small leak ignited by the pilot would heat the brass adapter that would then melt the aluminum. As the heat increased the leak would become worse causing the damage observed and igniting the flooring above. Had the gas line been properly connected and leak free, the loss should not have occurred.”
*1117 In spite of the above, however, at trial Mr. Hero stated that “I believe the cause and origin of the fire was external to the floor furnace.” (Emphasis supplied) Other testimony was that there was “another gas leak in the room” possibly and, more specifically, that there was gas in the chamber of the furnace, but that the source of the gas was not from the valve located within the furnace but rather “external to the gas valve from a leak on the outside.” He was unable to explain how, if there had been such an outside leak, there would not have been enormous explosion rather than the small explosion as “poof” as Mrs. Gui-dry described it.
With the above testimony and evidence before him the trial judge, in his words, “discounted” Mr. Hero’s testimony and accepted that of Mr. Vanderbrook. This, of course, was within his province and we are not in a position to say that in so doing he committed error. This is simply another of those cases wherein a conflict in expert testimony has been resolved by the trier of fact. There is a complete absence in the record of anything to show his evaluation of credibility and reasonable inference of fact constituted “manifest error” or was “clearly wrong,” in which case, under well settled jurisprudence, they will not be disturbed. See O’Brien v. Remington Arms, Co., Inc., 601 So.2d 330 (La.App. 2nd Cir. 1992).
There remains the question of attorney fees claimed by counsel for appellee. The trial court awarded the amount of $5,000.00 for services rendered in that court, which amount is included in the total of $80,736.00 for which defendant was cast; it is counsel’s position, however, raised in his answer to the appeal, that under the holding in O’Brien v. Remington Arms Co., Inc., supra, fees are due as well for services rendered in connection with the appeal to this Court. We find that the O’Brien decision and authorities therein cited do so hold and, accordingly, an additional award of $1,000.00 will be made as prayed for.
For the reasons assigned, the judgment appealed from is amended to award plaintiff total attorney fees of $6,000.00 and as thus amended affirmed.
AMENDED AND, AS AMENDED, AFFIRMED.

. While the petitioner asserts that Louisiana Coastal is entitled to recover $25,000.00, the subrogation document (P-I) shows the insurance coverage to total the sum of $20,000.00.