976 So.2d 738 (2008)
Dr. Charles ELLIOTT
v.
Cliff NORMAND and General Service & Supply, Inc.
No. 07-CA-569.
Court of Appeal of Louisiana, Fifth Circuit.
January 22, 2008.
*739 David M. Hufft, Attorney at Law, Belle Chasse, Louisiana, for Plaintiff/Appellee.
David H. Alfortish, Attorney at Law, Kenner, Louisiana, for Defendant/Appellant.
Panel composed of Judges MARION F. EDWARDS, WALTER J. ROTHSCHILD, and FREDERICKA HOMBERG WICKER.
FREDERICKA HOMBERG WICKER, Judge.
This is a breach of contract case. Plaintiff Dr. Charles Elliott entered into two agreements with defendant Cliff Normand whereby Cliff Normand agreed to repair Dr. Elliott's 27' Mercruiser Sea Ray boat and Dr. Elliott's 1988 Volvo automobile. After a bench trial,[1] the trial judge *740 granted judgment in favor of Dr. Elliott and against defendants Cliff Normand, and Cliff Normand's business, General Service and Supply Inc. Cliff Normand and General Service and Supply Inc. (Normand) appealed. They do not dispute liability. Rather they seek a decrease in damages. In addition, they seek to vacate the portion of the judgment that grants interest from the date of judicial demand. Dr. Elliott has answered the appeal seeking an increase in damages. For the reasons set forth below, we vacate in part, amend in part, and affirm as amended.
Facts
In September 1998, Dr. Elliott purchased a 27' Mercury twin-engine Sea Ray boat. Normand, who is a mechanic, assisted Dr. Elliott by negotiating a favorable price. Normand gave the seller an inflated estimate to get it running  $17,159.65. By doing so, Dr. Elliott was able to purchase the boat for only $5,000. The boat had been out of water for a least a year. Dr. Elliott did not know if the boat ran at all. After inspecting the boat, Normand determined that the two engines needed to be rebuilt.
Normand and Dr. Elliott entered into a repair contract whereby Normand agreed to rebuild the boat engines at a price of $25 per hour for labor plus costs for the parts. Dr. Elliott paid Normand $6,353.67 of Normand's $6,985.47 charge.
Normand testified he disassembled the engines, sent them to a mechanic's shop to be bored, put in new pistons, replaced the fuel pump, and installed an oil pump.
In December 1998 or January 1999, Normand and Dr. Elliott entered into another agreement whereby Normand agreed to repair Dr. Elliott's Volvo, which was overheating. They agreed Normand would be paid in accordance with the pay agreement for the boat. Normand stopped working on the engines in January 1999 and began working on the Volvo. It was not until May 1999 that Normand resumed work on the engines.
Normand disassembled the Volvo engine, rebored it, put in new pistons, and flushed the engine. Then when Normand completed the work, Dr. Elliott returned to complain about oil in the water reservoir. Normand spotted the oil but felt it was an insignificant amount of oil. He told Dr. Elliott that it took time to flush oil out of the water system. He agreed to flush it again but Dr. Elliott never again contacted Normand. Dr. Elliott paid Normand $6,821.33 for the Volvo repairs.
Normand testified that he probably completed putting the boat engines back together in October 1999. Before the engines were installed in the boat, Normand tested them in his shop by running each one approximately six to eight times for an hour or two hours at a time. He checked the oil pressure with a gauge that he had installed into the block. He ran the engines on an idle speed of 400 to 500 rpm. He saw no problems.
Normand explained that in order to remove the engines, Normand had to remove the outdrives, which are on the bottom. These were corroded and Dr. Elliott had worked on them to remove the corrosion. After that, Normand reinstalled the outdrives.
According to Normand, after Normand reinstalled the engines Dr. Elliott insisted on testing the boat. Although Normand determined that the engines were operational, some controls still needed to be hooked up. On the other hand, Dr. Elliott testified he did not recall Normand telling him that Normand did not want to take the boat out for a test run.
An unsuccessful test run was performed in October or November 1999.
*741 Normand testified that they ran the boat 45 minutes to one hour at 3000 rpm. At one point, it was increased to 4500 rpm for a short period. At 4500 rpm, Normand started hearing it knocking and it lost oil pressure. He told Dr. Elliott to immediately shut it down because Normand did not want to do any more damage. They shut off one engine  the other engine was running well. They returned to the shipyard with the other engine at a lower rpm. Dr. Elliott asked what was wrong. Normand said he did not know until they opened it up, and inspected it to see why it lost oil pressure, and made the noise.
According to Dr. Elliott, he questioned Normand about the low oil pressure reading on one engine and the different readings on each engine. He asked Normand if it was normal for there to be a difference. Norman said it was normal because no two engines were the same. Normand, however, testified that he did not know if Dr. Elliott expressed concern about the oil pressures. But, he knew the pressures were good so if he read a lower pressure he would not be concerned because different gauges read differently.
According to Dr. Elliott, they had to shut off the engine and drift into the dock because they could not put the boat in reverse or neutral. He said that Normand told him this was a simple fine-tuning matter and Normand would handle it.
Normand testified that he offered to correct the problem and then go for another trial run. Dr. Elliott, however, said he was disgusted. He said he had a friend with a slip in the Municipal Harbor and he would put the boat there and then call Normand to resume the work. Normand never heard from Dr. Elliott again until he was served with the petition in May 2000. If Dr. Elliott had contacted Normand, Normand would have done the repairs.
Dr. Elliott testified that after the run, he had serious doubts that Normand had the ability to perform any mechanical work. Dr. Elliott has not spoken to Normand since the day of the test run.
In November 1999 after the test run, Dr. Elliott took the boat to Gerald Carona.[2] The boat sat there until May 2000. Dr. Elliott hired Corona to get a second opinion.
Carona, an expert automobile mechanic with expertise in Volvo engines and mercruiser engines, testified he is very familiar with the type of engine used in the mercruiser and he has worked on them for approximately 30 years. He has broken down and repaired 50 to 60 such engines. Normand, however, testified that before the contract with Dr. Elliott, Normand had only worked on approximately four or five boat engines of this type.
Before Dr. Elliott brought the boat to Corona, Corona inspected the engines at the marina. He told Dr. Elliott the boat would have to come out of the water and the engines removed and taken apart. He saw that the engines did not have oil pressure. There was noise coming from both engines indicating an internal problem with the engines.
They started the engines and ran them at a low rpm. When the motor started, he was almost thrown out the back of the boat because the outdrives were not installed properly. This was a dangerous condition and it showed the incompetence of the person who did the work. There were problems with both engines. One had zero oil pressure. Normand improperly ran the engines in his garage. A professional facility to run the engines was required. The motor is designed to run in the boat. *742 The engine is designed to be run by the water pump, which is connected to the outdrive. This draws water up and brings it to the engine at a certain volume. Without the proper volume, the engine chambers will overheat.
When Carona broke the engine down, he saw hot spots in the engine that showed water was not properly fed to the engine. He was positive that when Normand tested the engines in his garage, he damaged them. Running at idle for a prolonged period of time is incorrect.
Dr. Elliott brought Carona the boat in November 1999. In May 2000, Carona began working on it. There was severe internal damage. It took Carona about 38-1/2 hours to inspect the engines. He billed Dr. Elliott $2,502.50 for the inspection of both engines and Dr. Elliott paid the bill.
Carona found metal in the oil pan from the bearings of the engine. He also found rust and water in the oil. Metal in the oil pan means a failure in the metal bearings of the engine and they are in the process of being destroyed. He found the oil pumps were not attached correctly. They were loose, causing the engines to lose oil pressure. The improper installation of the oil pumps caused destruction of the engine. This would result in a pressure loss because oil would be dumped back into the oil pan rather than being distributed in the engine. He found the bolts were not torqued at the proper values. This allowed water to get into the engine. There was damage due to the water. Also, there was an excessive 20/1,000 clearance between the cylinder head wall and the piston skirt of the engine. Seals were damaged and improperly installed. Water was leaking from a water chamber into the oil side of the engine. Rust was on the internal parts of the engine. Rust was not due to exposure to outside weather.
Carona charged Dr. Elliott a storage fee of $2,856 from November 13, 1999 to the end of June 2000 and Dr. Elliott paid it. His storage rate is $12 a day, which is a standard rate.
Carona felt the engines were totally destroyed and that it would cost $20,360 to repower and replace the engines.
Norman agreed that a clearance of 20/1,000 was excessive but he denied that he had allowed such a clearance. He said that water and oil will get into the engine when you dismantle it and the engine was rusted because of the time delay before the inspection.
Carona inspected the Volvo to determine why it was running roughly. The water system contained oil at almost 50/50 water and oil. If Normand had flushed out the cooling system, there should not be any oil in the water system. He found the engine was overheating. It appeared that oil was entering from the turbo area. This normally causes high deterioration of the engine. He estimated $6,791.57 to break the engine down, repair it, and put it together.
Judicial Interest
"The court shall award interest in the judgment as prayed for or as provided by law." La.C.C.P. art. 1921. La.R.S. 13:4203 provides: "Legal interest shall attach from date of judicial demand, on all judgments, sounding in damages, `ex delicto', which may be rendered by any of the courts."
Normand asserts and Dr. Elliott concedes that the trial judge erred in awarding legal interest from the date of judicial demand in a lawsuit involving a breach of a repair contract rather than a claim for damages ex delicto.
We agree with the parties that an award of damages from a breach of a repair contract does not qualify for pre-judgment *743 interest as intended by La. R.S.4203. Accordingly, we vacate that portion of the judgment awarding interest from the date of judicial demand.
Damages
An obligor is liable for the damages caused by his failure to perform a conventional obligation. A failure to perform results from nonperformance, defective performance, or delay in performance. La. C.C. art. 1994. Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived. LSA-C.C. art. 1995. An obligor in good faith is liable only for the damages that were foreseeable at the time the contract was made. La. C.C. art. 1996.
The standard for reviewing the award of damages for breach of contract is whether the trial court abused its discretion. Hernandez v. Martinez, 00-1282 (La.App. 5 Cir.2/28/01), 781 So.2d 815, 821 (citations omitted).

Foreseeable Damages
As to the car, the trial judge awarded the amount Dr. Elliott paid to Normand for the repair. But for the boat, the trial judge awarded the amount to replace the engines and Carona's storage fees. Normand contends that the only foreseeable contract damages were at most the contract amounts Dr. Elliott paid for the repairs. On the other hand, Dr. Elliott argues the trial judge abused his discretion in failing to award him all of his foreseeable damages.
Normand also asserts that the damage award should be reduced because Dr. Elliott did not give Normand the opportunity to correct any problems that may have existed in the initial work.
Dr. Elliott believed that because Normand caused severe damage from his repairs, Normand could not do the necessary repairs. Given Carona's testimony regarding Normand's incompetence, Dr. Elliott's belief and actions were reasonable under the circumstances. Furthermore, the trial judge apparently concluded that Dr. Elliott's actions in bringing the boat and car to Carona did not aggravate the damage that was already present.
With regard to the car, Normand testified he would have flushed it out again had the problem persisted. On the other hand, Carona testified that if Normand had flushed out the cooling system, there should not be any oil in the water system.
With regard to the boat, Normand testified that the rust in the engines was a result of the time delay before Carona's inspection. Carona disagreed. Carona testified the rust was not due to exposure to the weather.
The trial judge evidently attached greater weight to Carona's testimony. "`[G]reat deference is accorded to the trial court's factual findings, both express and implicit, and reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on appellate review of the trial court's judgment.'" Joseph v. Elmwood Medical Center, 98-115 (La.App. 5 Cir. 6/30/98), 715 So.2d 703, 705 (citation omitted). We find no manifest error in the trial judge's implicitly refusing to limit Dr. Elliott's damages on the basis Dr. Elliott failed to give Normand an opportunity to repair the items. Under the facts and circumstances of this case, we conclude that when the boat engines and the car failed to perform, Dr. Elliott had no obligation to return them to Normand. To preserve his claim for foreseeable damages, Dr. Elliott was not required to perform a futile act.
We now proceed with an inquiry as to the foreseeable damages.
*744 Costs for Refurbishing Boat
Dr. Elliott seeks an increase in the award to add $13,643.33 as reimbursement for the amount he incurred in refurbishing the boat.
Dr. Elliott testified that he performed maintenance on the boat to increase its value. Among other things, he painted it and placed a protective barrier coating on the boat. He also refurbished its interior. He spent about $20,000 to refurbish it. He has not operated the boat since the test run.
Normand testified he was aware that Dr. Elliott and Dr. Elliott's father were refurbishing the bottom of the boat. He was not aware of any other refurbishing work.
Normand testified that he and Dr. Elliott agreed Normand would work on Saturdays on the boat. Moreover, after Dr. Elliott requested that Normand work on the Volvo, Normand began working on the Volvo from January to May 1999 rather than working on the boat engines.
There was no evidence presented that there was a specified time period within which Normand was to complete the boat repairs.
The trial court considered the testimony and found that Dr. Elliott was not entitled to damages for refurbishing the boat. "A court of appeal should not set aside the factual findings of a trial court absent manifest error or unless clearly wrong." Siverd v. Permanent General Ins. Co., 05-0973 (La.2/22/06), 922 So.2d 497, 499, writ denied as moot, 05-0967 (La.4/24/06), 926 So.2d 532 (citation omitted). We do not find the trial court's failure to award this amount to be erroneous. The trial judge evidently determined that this amount was not a foreseeable object of the repair contract.
Payment for Boat Slip
Dr. Elliott seeks an increase in damages of $4,953.60 as reimbursement for loss of use and payment of a boat slip at Municipal Yacht Harbor. Dr. Elliott testified that after the boat had problems, he maintained a boat slip at Municipal Yacht Harbor. He maintained the slip because it is difficult to get another. He paid $206.40 per quarter. Although he has a boat slip, he cannot place it there without insurance. A boat without motors cannot be insured. The boat is presently in a dry dock at Carona's facility. He stored in at Corona's because he cannot store it at his home or office.
Dr. Elliott testified that the reason he could not store the boat at his home was because he purchased a trailer for a car and had no room. The new trailer took the place of the boat trailer. Before the boat repairs, he had stored the boat trailer at his home.
We find no error in the trial judge's failure to award these costs. The fact that Dr. Elliott could not store the boat at his home and had to pay for a boat slip was not an object of the repair agreement. There was no agreement that Normand had a specified time frame in which to repair the boat or that Normand would pay for these costs.
Carona's Bill for Inspection and Boat Storage
The trial judge did not award Dr. Elliott damages for Carona's inspection of the boat. Dr. Elliott argues that he erred because this was foreseeable damage. Dr. Elliott seeks $2,502.50 for Carona's inspection of the boat engines.
The trial judge evidently determined that a structural inspection was unnecessary to properly restore the boat. We find he erred. Normand testified that an inspection was necessary in order to determine *745 why there was a loss in oil pressure and a noise. Likewise, Corona testified that he broke the engines down in order to find out what was wrong. It was only through Carona's inspection that the cause of the failed test run could be determined. Thus, we amend the judgment to add $2,502.50 as reimbursement to Dr. Elliott for the amount he paid Carona to inspect the boat engines.
We find, however, that the trial judge abused his discretion in awarding Carona's storage cost of $2,856.00 for boat storage from November 13, 1999 to the end of June 2000. Carona did not work on the boat until May 2000. Dr. Elliott testified he could not store the boat at his home where he had at one time because he purchased a car trailer and had no room.
La.C.C. art. 2002 provides:
An obligee must make reasonable efforts to mitigate the damage caused by the obligor's failure to perform. When an obligee fails to make these efforts, the obligor may demand that the damages be accordingly reduced.
"This Article adjusts the conflict of interests that would otherwise exist when an obligee neglects to mitigate his damages and thereby exposes the obligor to further liability for consequences resulting from the obligor's failure to perform that were reasonably avoidable by the obligee." Lombardo v. Deshotel, 94 1172 (La.11/30/94), 647 So.2d 1086, 1092.
In a breach of contract action, an injured party has a duty to mitigate his damages. Rogers v. Nelson Dodge, Inc., 407 So.2d 443, 447 (La.App. 3 Cir.1981) (citations omitted). Dr. Elliott neglected to mitigate his damages as to the boat storage, thereby exposing Normand to further liability for consequences resulting from Dr. Elliott's failure to perform that were reasonably avoidable by Dr. Elliott. Furthermore, the storage costs from November to May were not damages that were foreseeable at the time the contract was made. Instead, only the 30-day storage fees incurred by Dr. Elliott in connection with Carona's inspection were foreseeable damages. Accordingly, we find that the trial judge abused his discretion in awarding storage fees in excess of 30 days. We amend the judgment to reduce the damage award for boat storage to allow only a 30-day storage fee of $360, based on Carona's standard rate of $12 per day.
Costs of parts and labor paid by Dr. Elliott for the Repairs
The trial judge awarded as damages the amount Dr. Elliott paid Normand for the car repair, but he did not award Dr. Elliott the cost he paid for the boat repair. Dr. Elliott asks this court to increase the award to include the amount he paid Normand for the boat repair. We find that the trial judge abused his discretion in failing to award Dr. Elliott $6,353.67 as reimbursement for costs of parts and labor paid by Dr. Elliott to Normand for the boat repair. Dr. Elliott paid Normand this amount to repair the boat and Normand failed to do so. We amend the judgment to add $6,353.67 as reimbursement for costs of parts and labor paid by Dr. Elliott to Normand for the boat repair.
Value
Normand argues that the damage award should be reduced because the award of damages exceeds the value of the boat and of the car.
We find that in this case, Dr. Elliott's award of $20,000 is not foreseeable. Dr. Elliott purchased a boat for $5,000 with engines that had to be rebuilt. He negotiated an inflated price based on an estimate of $17,159.65 to rebuild the engines. Carona provided an estimate of *746 approximately $20,360 to replace the engines. Dr. Elliott did not pay Normand $17,159.65. Instead, he paid him $6,353.67 of Normand's $6,985.47 charge.
This case is analogous to Davidge v. H & H Const. Co., 432 So.2d 393, 395 (La. App. 1 Cir.1983). In that case, which concerned defective cabinet work, the First Circuit reduced the damage award because the trial court had awarded an amount for cabinet replacement of a greater quality than the original cabinet. There the evidence proved that the replacement work utilized better quality materials than what was originally used in the construction. Likewise, we find that the trial judge abused his discretion in awarding $20,000 as new engines to replace the original engines that needed to be rebuilt. Thus, the trial judge awarded an amount that exceeded the value of the original engines. The $20,000 amount of damages is amended to $6,353.67 which is the amount that Dr. Elliott lost  the amount he paid Normand for the repair of the boat.
Carona testified that he gave Dr. Elliott an estimate of what it would cost to repair the car  $6,791.57  to break the engine down and repair the Volvo. The trial judge awarded the amount Dr. Elliott paid Normand for the repair. Since Normand failed to make the repair, there was no error.
Dr. Elliott seeks an increase in damages to add $307.82 for an inspection of the car.
Dr. Elliott testified that after he submitted the Volvo to Carona, he drove the car to Bergeron Volvo and obtained an inspection at a cost of $307.82. Carona, however, inspected the car and gave Dr. Elliott an estimate for its repair. The trial judge did not err in failing to award $307.50 for an additional inspection.

DECREE
For the above and foregoing reasons, we vacate the portion of the judgment that awards judicial interest from the date of judicial demand. We amend that portion of the judgment that awards $20,000 for the boat and reduce that award to $6,353.67 as reimbursement for costs of parts and labor paid by Dr. Elliott to the defendants for the boat repair. We amend the judgment to reduce the amount awarded for boat storage from $2,856 to $360. We amend the judgment to award Dr. Elliott the following additional amount of damages: $2,502.50 as reimbursement for the amount paid to Gerald Carona for inspecting the boat engines. In all other respects, we affirm the judgment of the trial court. Each party is to bear his own costs of this appeal.
VACATED IN PART; AMENDED IN PART; AFFIRMED AS AMENDED.
NOTES
[1] Attorneys Scott W. McQuaig and W. Chad Stelly filed a petition for intervention seeking attorney's fees. On the day of trial, the trial judge agreed to sever the intervention claim.
[2] He is also referred to as "Jerry Caronia."