STEPHEN J. WINDHORST, Judge.
| ^Defendants, Manitowoc Corporation and its liability insurer Sentry Insurance Company (“Manitowoc”), appeal from a judgment in favor of T.L. Starke, Inc. (“Starke”) and Roy K. Saia o/b/o Algiers Roy & Sons Music Company Inc. (“ARS”).[1] The trial court found that plaintiffs bore their burden of proving liability and it awarded damages totaling $109,477.23 to Starke and $54,076.02 to ARS. In a separate judgment, the trial court denied Manitowoc’s motion for sanctions. For the reasons that follow, we amend the judgment, and as amended, affirm. We further affirm the trial court’s denial of Manitowoc’s motion for sanctions.
This suit arises from a fire that occurred in Mulligan’s Tavern (“Mulligan’s”). Mulligan’s was located in a shopping center owned by Esplanade Plaza, L.L.C. (“Esplanade”) on Severn Avenue in Metairie, Louisiana. At, .the time of thé fire, Mulligan’s was owned by Flappery, Inc. (“Flap-pery”) and operated by Starke.[2] Located inside Mulligan’s were video poker and amusement' devices that were owned and operated by ARS.
hPrio’r to the fire, Flappery entered into negotiations with Starke for the sale of Mulligan’s. According to their agreement, Starke took over management of the business while it waited for its video poker and alcohol licenses. Starke began managing the business on April 1, 2006., Also on April 1, 2006, Starke purchased a Manito-woc Series 600 ice machine, which was installed by Olivier’s Air Conditioning and Heating.
In the early morning hours of April 29, 2006, a fire started in the Manitowoc ice maker, causing damages and necessitating closing of the business while repairs were made. After the fire, and during the repairs process, Flappery and Starke renegotiated the sale of Mulligan’s. Starke ultimately assumed ownership and Mulligan’s reopened in January of 2007. The business closed one year later.
Starke and ARS filed this suit for lost revenue and damages incurred from the date of the fire until Mulligan’s reopening in January of 2007. After trial, on the merits, the court found that the ice maker was defective and that Manitowoc was liable for the damages caused by the fire. Manitowoc appeals.
In its appeal, Manitowoc assigns the following as error:
1. The trial court erred in applying res ipsa loquitur to find a manufacturing defect in the Manitowoc ice machine because under Louisiana law:
a) Plaintiffs cannot take advantage of a presumption of defect because direct evidence was spoliated by Plaintiffs’ expert before it was examined.
b) The evidence did not sufficiently eliminate other causes of the fire.
2. The trial court erred in finding a manufacturing defect in the Manitowoc ice *737 machine because Plaintiffs did not.present evidence to establish that the product deviated from Manitowoc’s specifications or performance standards as required by La. Rev.Stat. 9:2800.55.
3. The trial court-erred in'-awarding video poker revenue (as opposed to lost profits) to Plaintiffs without taking the expenses necessary to generate the revenue into account.
| f¡4. The trial court erred, in awarding rental payments which Plaintiffs had, no legal obligation to pay.
5. The trial court erred in awarding undocumented building repair expenses which were voluntarily made.
6. The trial court erred in awarding Starke damages for property (a) Starke did not own at the time of the fire, and (b) for which Starke had previously received reimbursement.
7. The trial court erred in denying the motion for sanctions because of Plaintiffs’ repeated violation of the Court’s discovery Orders and testimony at trial established that prior representations regarding the non-existence of responsive documents were patently false.
CAUSATION
A bifurcated trial was held with both the issues of liability and damages presented to the judge. After the conclusion of the hearing on liability,, the trial court found that plaintiffs had borne their burden of proof.[3]
To prove causation, plaintiff Starke presented the testimony of George Hero, who was qualified as an expert in electrical engineering and fire origin and causes. Mr. Hero was originally hired by Caitlin Insurance, Mulligan’s insurance carrier. Defendant Manitowoc presented the testimony of Robert Russell, who qualified as an expert in origins and causes of fire.
As stated previously, Starke took over management of Mulligan’s on April 1, 2006. On that day, Starke had a brand-new Manitowoc ice machine installed. The fire occurred in the early morning hours of April 29, 2006, when the bar was closed. At the end of a long bar, there was. an alcove, or a little storage room, that |ficontained the ice machine and some miscellaneous, storage. With the exception of the alcove, the majority of the damage to the premises, was caused by heat and smoke, not fire. On first inspection, it was obvious that the source of the heat was around the ice machine. There was no evidence that the floor of the premises had caught fire.
Mr. Hero testified that he started his investigation by photographing the unit in place. . He then called Mr. Olivier, of Olivier’s Air Conditioning, Heating and Refrigeration, and they removed the unit from the alcove. They discovered that, based on the pattern of the fire, the origin had to be within the machine. At that point, they ceased examining the machine and called for .a. Manitowoc, representative. Further examination of. the premises showed that *738 the building wire was not damaged, and the junction box coming out of the wall was not damaged. The aluminum coil attached to the ice machine was damaged only on the inside of the unit, and not on the backside toward the wall, showing that the heat was within the unit. The pattern of the fire indicated ignition within the ice maker and no defects or source of ignition was found anywhere else in the building.
Later, Mr. Hero was joined by Robert Russell from Manitowoc, and Mr. Hero conducted a second inspection of the unit. During that inspection, he removed the ice maker from the ice bin, and wrapped the ice maker in plastic so that it could be stored for a second, more detailed inspection. Mr. Hero again concluded that the source of the ignition was within the ice maker.
Mr. Hero conducted a third inspection in which the unit was completely dismantled and every piece was inspected. By agreement of all present, including Mr. Russell, the pieces were not separately bagged; instead they were dumped in the ice bin. Mr. Hero testified that after this last inspection was concluded, there |7was nothing left of the ice maker except torn apart scraps, which could not be reassembled. He stored these scraps for a while, and then threw them away.
This third inspection revealed that the condenser and evaporator fan motors were badly burned. The compressor motor had an internal short, but was not grounded. The case of the ice maker was in good shape and there was no evidence of overheating. The external connectors were proper. The end of the control wire had “a melt,” which indicated that the fire reached 2,000 degrees. The pattern of the fire indicated that it started within the machine, and ignited the shelving and combustibles stored above the machine. Mr. Hero testified that he saw no evidence of improper installation. This inspection confirmed Mr. Hero’s original conclusion that the origin of the fire was within the ice machine from an internal defect within the machine, and not from the external connections or any internal source other than the machine itself.
Mr. Hero testified at trial that he found no evidence to suggest that the fire originated anywhere else but inside the machine. He also found no evidence to suggest an improper installation of the machine, including no evidence of arcing. His final opinion was that an internal short was the source of the ignition of the fire. He testified that it was mainly the controls and pressure switches in the ice maker that were destroyed. Mr. Hero stated that he did not think the fire started in the compression motor.
Mr. Russell, who was also present at this last, destructive inspection, testified at trial that he saw no evidence of an internal defect with any of the manufactured components within the ice machine. He also stated that he believed that whoever installed the machine did not do a “good” job. His opinion was that there were loose electrical connections, where there were exposed strands of wire |sat the wire nut, which somehow started the fire. He further testified that if the improper installation did not start the fire, then the cause was undetermined.
D.G. Muller, staff engineer at Manito-woc, testified that each ice machine was functionally tested after assembly. He stated that if there was an electrical fault within the machine, he would expect it to show up during this quality control process. He further testified that there was a fail-safe within the machine that would shut down the system if there was a short. In order for a fire to occur, there would have to be simultaneous failures of systems within the machine. Mr. Muller ad *739 mitted that he did not examine the particular machine at issue prior to trial.
It is well-settled that a reviewing court may not disturb the factual findings of the trier of fact in the absence of manifest error. Arabie v. CITGO Petroleum Corp., 10-2605 (La.03/13/12), 89 So.3d 307, 312; Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1979). In Arceneaux, the Louisiana Supreme Court set forth a two-part test for the appellate review of facts: (1) the appellate court must find from the record that there is a reasonable factual basis for the finding of the trial court, and (2) the appellate court must further determine that the record establishes the finding is not clearly wrong or manifestly erroneous. Arceneaux, 365 So.2d at 1333; Arable, 89 So.3d at 312. If the trial court’s findings are reasonable and not clearly wrong in light of the record reviewed in its entirety, the appellate court may not reverse. Arabie, 89 So.3d at 312; Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). Consequently, when there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous. Arabie, 89 So.3d at 312; Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880, 883 (La.1993).
19Here, the trial court first made a factual finding, based on the evidence presented, that the fire started within the ice maker and not at the installation juncture. We find no manifest error in this determination.
Having found that the' fire started within the machine, the court then applied the doctrine of res ipsa loquitur. The doctrine of res ipsa loquitur is a rule of circumstantial evidence that creates an inference of negligence on the part of the defendant when the facts of the case indicate that the negligence of the defendant is the probable cause of' the accident and there is an absence of other equally probable explanations offered by credible witnesses. Montgomery v. Opelousas Gen. Hosp., 540 So.2d 312, 319 (La.1989). “The doctrine allows an inference of negligence to arise from the common experience of the factfinder that such accidents normally do not occur in the absence of negligence.” Id. The Louisiana - Supreme Court held that res ipsa loquitur: ■
applies in cases involving circumstantial evidence, rather than direct evidence, provided the plaintiff establishes the following foundation of facts: (1) the injury is of the kind which does not ordinarily occur in the absence of negligence; (2) the evidence sufficiently eliminates other possible causes of the injury, such as the plaintiffs own responsibility or the. responsibility of others; and (3) the alleged negligence of the defendant must fall within the scope of his duty to the plaintiff, which will often be the case if the defendant had exclusive control of the thing or situation that caused the injury to the'plaintiff. '
Linnear v. CenterPoint Energy Entex/Reliant Energy, 06-3030 (La.9/5/07), 966 So.2d 36, 45. See also Spott v. Otis Elevator Co., 601 So.2d 1355, 1362 (La.1992).
The doctrine of res ipsa loquitur is circumstantial evidence, not substantive law. State Farm Mut. Auto. Ins. Co. v. Wrap-On Co., 626 So.2d 874, 876-877 (La.App. 3 Cir.1993), writ denied, 93-2988 (La.1/28/94), 630 So.2d 800, citing Cangelosi v. Our Lady of the Lake Regional Medical Center, 564 So.2d 654 (La.1989).10 Circumstantial evidence is evidence of fact, from which the fact sought to be proven may be inferred. Id. In other words, circumstantial evidence is evidence which tends to prove or disprove a fact, and from *740 that fact one may logically conclude that the fact sought to be proven exists.
All that is meant by res ipsa loquitur is ‘that the circumstances involved in or connected' with an accident are of such an unusual character as to justify, in the absence of other evidence bearing on the subject, the inference that the accident was due to the negligence of the one having control of the thing which caused the injury. This inference is not drawn merely because the thing speaks for itself, but because all of the circumstances surrounding the accident are of such a character that, unless an explanation can be given, the only fair and reasonable conclusion is that the accident was due to some omission of the defendant’s duty.’ (Footnote omitted).
Wrap-On Co., supra at 876-877, citing Larkin v. State Farm Mutual Automobile Insurance Co., 233 La. 544, 97 So.2d 389, 391 (La.1957).
This Court has previously said that the doctrine of res ipsa loquitur applies when:
(1) the accident would not normally occur in the absence of negligence, (2) there is an absence of direct evidence to explain the activities leading to the injury, and (3) the accident or injury was caused by an agency on instrumentality within the actual or constructive control of the defendant. Thus, the plaintiff must show that the injury would not normally occur in the absence of negligence. Id. As long as the fact-finder can “reasonably conclude that plaintiffs injuries were, more probably than not, caused by defendant’s negligence under the particular facts of a case, the doctrine of res ipsa loquitur applies.” Id. (citations omitted).
Powell v. Chabanais Concrete Pumping, Inc., 11-408 (La.App. 5 Cir. 12/28/11), 82 So.3d 548, 557; Ullrich v. Jefferson Parish Hospital Service District No. 2, 03-0958 (La.App. 5 Cir. 1/27/04), 867 So.2d 7, 12.
The doctrine of res ipsa loquitur has been applied to products liability cases. See Weber v. Fidelity & Casualty Insurance Company of New York, 259 La. 599, 250 So.2d 754 (1971); Guidry v. Louisville Tin & Stove Co., Inc., 613 So.2d 1114 (La.App. 5 Cir.1993).
In this case, once the trial court made the factual finding that the fire originated within the ice maker, and was not the cause of faulty installation, it then needed to determine what caused the fire. The trial court did not err in determining that, having found the fire started within the ice maker, the only fair and reasonable conclusion was that there was a defect within the ice maker that caused the fire.
Manitowoc next argues that Starke cannot take advantage of a presumption of defect because the direct evidence was spoliated by plaintiffs’ expert before it was examined.
The theory of “spoliation of evidence” refers to an intentional destruction of evidence for the purpose of depriving opposing parties of its use. The tort of spoliation of evidence has its roots in the evidentiary doctrine of “adverse presumption,” which allows a jury instruction for the presumption that the destroyed evidence contained information detrimental to the party who destroyed the evidence unless such destruction is adequately explained. Desselle v. Jefferson Parish Hosp. Dist. No. 2, 04-455 (La.App. 5 Cir. 10/12/04), 887 So.2d 524, 534. However, the presumption of spoliation is not applicable when the failure to produce the evidence has a reasonable explanation. Allen v. Blanchard, 99-0277 (LaApp. 1 Cir. 03/31/00), 763 So.2d 704, 710.
Mr. Hero testified that he was hired by Caitlin Insurance, insurer for then owner *741 Flappery. He conducted several inspections of the ice machine. The first inspection was cursory, at which time he called for a representative of Manitowoc to be present. Ronald Russell, Manitowoc’s expert, was present during the second inspection and also during the third inspection, when the ice maker was dismantled and analyzed in detail. All parties had an opportunity to inspect each piece at that |12time. As each piece of the unit was analyzed, it was placed into the ice bin of the unit. No one present at the inspection, including Mr. Russell, requested that any' piece be preserved. Mr. Hero stated that he retained the pieces for a period of time after the inspection and disposed of them only after his client, Caitlin, had settled its portion of the ease. At the time of disposal, the pieces left had no probative value and there was no way the unit could have been reassembled. We find that the failure to produce the evidence had a reasonable explanation and therefore the theory of spoliation is not applicable in this case.
Finally, defendants argue that the evidence did not sufficiently eliminate other causes of the fire. They further contend that the trial court erred in finding that a manufacturing defect existed because plaintiff did not present evidence to show that the product deviated from Mani-towoc’s specifications or performance standards as required by La. R.S. 9:2800.55.
La. R.S. 9:2800.51 et seq. establishes the exclusive theories of liability for manufacturers for damage caused by their products. La. R.S. 9:2800.52. A manufacturer is liable for damages proximately caused by an unreasonably dangerous product when the damages arose from a reasonably anticipated use of the product. La. R.S. 9:2800.54(A). A product may be deemed unreasonably dangerous due to its composition or construction, its design, the manufacturer’s failure to provide an adequate warning, or the product’s failure to conform to an express manufacturer’s warranty. La. R.S. 9:2800.54(B). The plaintiff bears the burden of proving the alleged defect. La. R.S. 9:2800.54(D). In order to prove a product is unreasonably dangerous in construction or composition, it must be shown that at the time the product left the manufacturer’s control, -it deviated in a material way from the manufacturer’s specifications or performance standards for the product, or if the product deviated from otherwise identical products made by | iathe same manufacturer. La. R.S. 9:2800.55. Hanover Am. Ins. Co. v. Trippe Mfg. Co., 37,060 (La.App. 2 Cir. 04/09/03), 843 So.2d 571, 575. La. R.S. 9:2800.55 provides that “A product is unreasonably dangerous in construction or composition if, at the time the product left its manufacturer’s control, the’product deviated in a material way from the manufacturer’s specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer.”
Testimony established that the ice maker was new, and that the fire occurred less than one month after installation. Therefore, the trial court, having found that the origin of the fire was within the ice maker, did not err in finding that the ice maker was defective.
We find Manitowoc’s first two assignments of error to be without merit.
DAMAGES
After the trial court ruled on the issue of liability, the second phase of the trial concerning the amount of damages suffered was conducted. The trial court rendered judgment awarding damages as follows:
*742 [[Image here]]
| ^Relevant to Manitowoc’s assignments of error challenging the award of damages is the agreement entered into between Flappery and Starke, and Starke’s subsequent lease agreement with Esplanade.
Testimony and exhibits at trial established that, at the time of the fire, Flap-pery was the owner of Mulligan’s, and leased the space from Esplanade. Starke’s president and manager, Albert Temes, testified that 'Starke was formed for the purpose of buying a business, and Mulligan’s became available. The members of Starke were interested in Mulligan’s because of the video poker revenue, which was about $3,000.00 per week. Temes stated that he did not examine Flappery’s books and was not interested in the bar sales. He knew the business would be profitable because of the video poker revenue.
The original purchase price was $165,000.00. Starke entered into a management agreement with the intent of going to Act of Sale within 30-45 days. However, because of the length of time required to obtain video poker and liquor licenses, the agreement provided that Starke would take over management of Mulligan’s for the period of time needed to obtain those licenses.
Starke began managing the bar on April 1, 2006, at which time its contents were still owned by Flappery. Temes testified that Starke immediately made several improvements: it purchased the ice machine and several TVs, it installed a new stereo system, it cleaned and painted the interior, and did some redecorating. The fire occurred on April 29, 2006, four weeks later. As a result, the purchase agreement became null on May 1, 2006.
Repairs to Mulligan’s were performed by Starke, and the process took about 35 weeks. Mulligan’s reopened on January 2, 2007.
On November 10, 2006, prior to the reopening of Mulligan’s, Starke entered into a second purchase agreement with Flap-pery, contingent on Starke’s ability to |1Bobtain a lease from Esplanade, which Starke was able to obtain after agreeing to pay Esplanade for lost rents while the building was under repair. The purchase agreement also provided an assignment of insurance proceeds from Flappery to Starke.
The actual asset sale between Flappery and Starke occurred on February 12, 2007, for the same price of $165,000.00 that was set before the fire.
After Mulligan’s reopened, it never returned to its pre-fire video poker revenues. Starke sold the business in 2008, and the purchasers took over management on February 1, 2008.
*743 Manitowoc first argues that the trial court erred in its award for video poker revenue and coin machine revenue without taking into account the losses incurred by operating the bar itself.
Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. La.C.C. art. 2315. Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived. La.C.C. art. 1995. In general, lost profits are calculated by deducting the expenses that would have been incurred from the gross revenues that would have been derived from the contract. First Alarm Fire Equip., Inc. v. Southland Int'l of La., Inc., 47,823 (La.App. 2 Cir. 05/08/13), 114 So.3d 1168, 1172.
Plaintiffs stated that, from December 22, 2005 until the date of the fire, Mulligan’s had a profitable video poker business that averaged $2,937.85 per week after expenses. Starke and ARS split the revenues 55/45’ percent respectively, giving Starke a weekly revenue of $1,615.82 and ARS a weekly revenue of $1,322.63. According to ARS, these figures included deducting for expenses, contrary to Manito-woc’s assertions. In addition, Mulligan’s had a music box and a countertop game, with revenue of about $130.00 per week, which Starke and ARS 11Bsplit equally. Mulligan’s was closed after the fire for 35 weeks and three days. Accordingly, for the time period that Mulligan’s was closed, Starke lost video poker profits of $57,248.50 and ARS lost video poker profits of $46,839.52. In addition, each lost coin revenue of $2,294.50.
On the record, Starke waived its claim for alleged bar income. As a result, the trial court allowed questioning to issues related specifically to video poker losses, and not to other income the bar may have enjoyed. Manitowoc proffered exhibits and testimony from Charles Theriot, CPA, who was qualified as an expert in forensic accounting and evaluation- of lost profits. Mr. Theriot stated that in order to derive income from video poker -machines, they had to be placed in a business establishment, whether it was a bar, restaurant, hotel, off-track betting establishment or video poker truck stop. Thus, in order for Starke to operate video poker, it had to also operate Mulligan’s. Mr. Theriot concluded that Mulligan’s would have operated at a $44,000.00 loss had it been open during the time period of the repairs.
In its assignment of error regarding lost income, Manitowoc argues that the trial court erred in excluding this testimony, and in failing to deduct Mulligan’s net loss from the video poker revenue for the purpose of calculating damages. We agree. We find that the trial court erred in failing to allow Mr. Theriot’s proffered testimony concerning Mulligan’s business losses. Despite Starke’s waiver of its claim 'for the loss of Mulligan’s “profits,” Mulligan’s actually operated at a loss, excluding video poker revenues. Revenue from video poker made Mulligan’s profitable, and the net losses due to the operational expenses of Mulligan’s were relevant and necessary to determine the net profit of the business. Had Mulligan’s remained open during the time in question,. Mulligan’s and Starke would have continued to incur operating expenses. Revenues from video poker would have |17been offset by those expenses (or losses attributable, to operation of the bar) to determine the profits gained during that time period.
Further, Louisiana R.S. 27:413 requires, and Mr. Theriot testified that, in order to be licensed to receive and operate video draw poker devices, a licensee must operate one of four types of establishments: bar, restaurant, off-track betting, or truck stop. Without the alcoholic beverage and *744 food operation Of Mulligan’s, and Mulligan’s conforming premises, the owner/operator of Mulligan’s could not be licensed to receive and operate video draw poker devices, and plaintiffs could not receive video poker revenue. Video poker was an indivisible part of Mulligan’s in both practical and legal senses. Therefore, the expenses incurred by Mulligan’s as the business establishment were indispensable to realizing video poker revenue.
We therefore find that the trial court erred in failing to consider what would have been Mulligan’s expenses and net loss during the time period in question. We further find that the trial court committed manifest error in its award of video poker revenue to Starke, without deducting the expenses it would necessarily have' incurred in order to realize those revenues.
The trial court awarded Starke lost video poker revenue of $57,298.50. Subtracting the $44,000.00 lost by the business at that time, we find that Starke lost income is in the amount of $13,298.50, and we amend the judgment of the trial court accordingly. We affirm the damage award to Starke of $2,294.50 for loss of coin machine revenue.
Considering ARS’s award of video poker revenue and lost coin machine revenue, Roy K. Saia, president and owner of ARS, testified that ARS’s expenses were fixed, and encompassed multiple locations. Fixed costs are not to be deducted from gross revenues in determining an award for lost profits. Rosbottom v. Office Lounge, 94-894 (La.App. 3 Cir. 04/05/95), 654 So.2d 377, 379. We find no error in the trial- court’s award of loss of video poker revenue and loss of coin¡ machine revenue to ARS,
Next, Manitowoc argues that the trial court erred in awarding damages’for rental payments that Starke and ARS were not required to pay. Manitowoc argues that at the time of the,fire, Starke did not have a lease with either Flappery or Esplanade and was not paying rent to either entity. Starke and ARS agreed to pay $11,375.00 to cover Esplanade’s lost rents while repairs were being made, with Starke paying $7,583.00 (2/3) and ARS paying $3,792.00(l/3).[4] Esplanade required this agreement as a condition of the lease Starke entered into to reopen Mulligan’s after the fire. Manitowoc also argues that the trial court erred in. awarding building repair expenses, contending that Starke had no legal obligation to pay these expenses, and further that Starke did not present sufficient evidence to support these awards.
Manitowoc first contends that plaintiffs are not entitled to damages for either the lease payments or for building repair expenses because Starke breached its duty to mitigate damages. Manitowoc argues that, after the fire, Starke could have simply walked away from the sale, in which ease it would not have suffered the damages incurred by continuing with its plans to purchase Mulligan’s.
La. C.C. art.2002 provides that “An obligee must make reasonable efforts to mitigate the damage caused by the obli-gor’s failure to perform. When an obligee fails to make these efforts, the obligor may demand that the damages be accordingly reduced.” The standard by which an obli-gee’s actions are judged is that of a rea *745 sonable man- under like circumstances. Dixie Sav. & Loan Asso. v. Bonura, 549 So.2d 424, 426 (La.App. 5 Cir.1989). “This Article adjusts the conflict of interests that would otherwise exist when an obligee neglects to mitigate his damages and thereby exposes the obligor to further liability for consequences resulting from the obligor’s failure to perform that were reasonably avoidable by the obligee.” Elliott v. Normand, 07-569 (La.App. 5 Cir. 01/22/08), 976 So.2d 738, 745.
In this case, Starke elected to go through with the purchase after the fire and after rights to insurance proceeds had been assigned to it. Unfortunately, what should have been a three-month repair time, as judged by the landowner’s insurer, stretched to approximately eight months through no fault of Starke. By the actual time of the sale, Starke had already made a substantial investment. We find that a reasonable man under like circumstances could have made the same decision to continue with the purchase. We therefore find that the duty to mitigate was not breached in this case.
Manitowoc also contends that the trial court erred in awarding lease payments that Starke was not legally obligated to make. However, Starke was obligated to pay the rents if it wanted to obtain a lease with Esplanade in order to re-open Mulligan’s. Accordingly, the trial court did not err in awarding damages for these rental payments.
Manitowoc next contends that the trial court erred in awarding damages for building repairs that were not substantiated at trial. However, at trial Temes testified as to payments, he made for repairs made that were not reimbursed by insurance proceeds, as well as the $5,000.00 deductible that Esplanade was not willing to pay for the repairs. In addition, he presented receipts for those repairs. ' The trial court’s finding ¡ that Temes made these payments, was not manifestly erroneous.
|gnIn its next assignment of error directed toward the amount of damages awarded, Manitowoc contends that the trial court erred in awarding Starke contents replacement of $24,053.82 for damages for property (a) Starke did not own at the time of the fire; and (b) for which Starke had previously received reimbursement.
Manitowoc’s first argument contends that because the purchase had not been completed at the time of the fire, Starke did not own the items in Mulligan’s and therefore should not be compensated for his costs in replacing these ■ articles. Starke assumed all of the rights and liabilities of Flappery, and therefore was entitled to receive compensation that Flappery would have incurred in replacing those articles.
Manitowoc next argues that the trial court erred because it failed to find that Starke had previously'received reimbursement for this damages property. At trial, Temes presented evidence to show that contents loss totaled $71,162.82 and that Flappei-y’s insurer paid $47,109.00. Mani-towoc offered no evidence to controvert these claims. Accordingly, we see no manifest error in the trial court’s ruling awarding to Starke $24,053.82 for contents replacement.
SANCTIONS
In its last assignment of error, Manitowoc alleges that the trial court erred in denying its motion for sanctions based on what it contends were ARS’s failure to comply with discovery orders. The trial' court has much discretion in imposing sanctions for failure to comply with discovery orders, and its ruling should not be reversed absent an abuse of discretion. Gauthier v. Harmony Constr., LLC, 13-269 (La.App. 5 Cir. 10/09/13), 128 So.3d *746 314. Here, we find no abuse of the trial court’s discretion in imposing no sanctions.
| ⅞1 CONCLUSION
Considering the foregoing, we amend the trial court’s judgment to reduce the award to plaintiff T.L. Starke, Inc. for the loss of video poker revenue from $57,298.50 to $13,298.50, and as amended, affirm. We further affirm the ruling of the trial court denying Manitowoc’s motion for sanctions. Each party is to bear its own costs.
AMENDED, AND AS AMENDED, AFFIRMED; DENIAL OF MOTION FOR SANCTIONS AFFIRMED.

. Initially, suit was filed by Albert Temes, Jr., Stephen C. Juan, Raymond Olivier, Jr., Dor-man Todd Davidson, and Edward J. Branley, Jr., individually and on behalf of T.L. Starke, Inc. The individual plaintiffs were dismissed from the suit by the grant of an exception of no right ofaction filed by Manitowoc. ..

. A separate suit was filed by Esplanade Plaza against Manitowoc and also against Olivier’s Air Conditioning and Heating. Flappery and its insurer Caitlin Insurance Company inter- ■ vened in that suit. The claims were settled and Esplanade Plaza’s suit was, dismissed on January 7, 2010. Flappery’s intervention was dismissed on April 27, 2010.

. The trial court, in oral reasons for judgment, said that:
I do believe that the doctrine of res ipsa does apply, and I believe, that the plaintiffs have borne their burden of proving liability here.
I am impressed by the fact that there is no arcing or evidence of the wires melting at the point that the defendants allege that the fire began.
Also, I think that it is certainly reasonable, we all know that the wire nut’s plastic covering would have at least come down and covered some of that exposed wire that we’re looking at. And I’m not convinced that the positioning of that wire wouldn’t have been different prior to the fire, and that a firé that’s of the intensity that this obviously was could not have affected the location of those wires.

. Esplanade’s insurer compensated Esplanade for three months’ rent following the fire, representing the amount of time that it believed repairs could have been accomplished. Temes testified that repairs took longer because the fire occurred shortly after Hurricane Katrina caused massive damage to the area, limiting the availability of contractors and supplies.